**UNITED STATES of America ex rel. Edward BENNETT, Plaintiff,**

**v.**

**Arthur T. PRASSE, Former Commissioner, Pennsylvania Bureau of Corrections, et al., Defendants.**

**No. 70–1549.**

United States District Court,
E. D. Pennsylvania.

Feb. 25, 1976.

Keith Welks, Third Year Law Student, University of Pa. Indigent Prisoner Litigation Program, for plaintiff.

Michael Minkin, Deputy Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

Plaintiff in this civil rights case[1] is a state prisoner serving a 21 to 42 year sentence for second degree murder, aggravated robbery and conspiracy. Originally confined in 1967 at the State Correctional Institution at Graterford, plaintiff was demotionally transferred approximately sixteen months later to the State Correctional Institution at Pittsburgh. On January 21, 1970, plaintiff was retransferred from Pittsburgh to Graterford to accommodate a Philadelphia court appearance and remained at Graterford until July. The gravamen of his complaint is that, in being relegated to administrative segregation status for the entire five and one half month period spent at Graterford while awaiting court proceedings in Philadelphia, he was deprived of liberty without due process and denied equal protection of the law.

Plaintiff filed this action *pro se* on June 11, 1970, and the case was assigned to our late colleague Judge Ralph C. Body. Judge Body appointed law student counsel for plaintiff pursuant to Local Civil Rule 9½ in February 1972. Thereafter, defendants moved for summary judgment; the motion was granted on August 16, 1972.[2] Plaintiff appealed, and, in an unpublished *per curiam* opinion filed on March 26, 1974, the Court of Appeals held that Judge Body erred in granting summary judgment on plaintiff's equal protection and due process claims and remanded the case for further proceedings consistent with its opin-

1. Plaintiff alleged a cause of action based upon 42 U.S.C. § 1983, with jurisdiction based upon 28 U.S.C. §§ 1331 and 1343(3), and sought injunctive and "other relief." Subsequently, plaintiff amended his complaint in order to add a specific claim for money damages. The caption, styled as a habeas corpus action, is taken from plaintiff's original, handwritten complaint and has never been amended to reflect the true nature of the case.

2. Judge Body declined to hold that plaintiff was entitled to an adversary hearing prior to his being placed in administrative segregation and thereby reduced the due process inquiry to a determination of whether plaintiff was treated in an arbitrary and capricious manner by prison officials. Judge Body found no evidence in the record to justify such a finding and concomitantly rejected the equal protection claim. He also dismissed plaintiff's eighth amendment claim, holding that the facts alleged did not amount to cruel and unusual punishment.

ion.[3] The Court of Appeals also: (1) upheld Judge Body's disposition of plaintiff's eighth amendment claim; (2) suggested that on remand the due process claim be considered in the light of several of its intervening opinions regarding the due process rights of prisoners subjected to special disciplinary treatment;[4] and (3) noted that should plaintiff prevail on the merits, his relief must be limited to damages. Plaintiff was no longer at Graterford, and the regulations governing administrative segregation of prisoners had been changed to incorporate the procedural safeguards required by the Third Circuit decisions cited at note 4, *supra*.

Plaintiff's due process claim is substantive and not procedural; the specific due process requirements announced by the Court of Appeals after the events in question and subsequently implemented are not retroactive. See *Wolff v. McDonnell*, 418 U.S. 539, 573–74, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). However, plaintiff contends that fundamental notions of substantive due process require that segregative confinement be based on some actual infraction of prison rules or a showing of present danger, even if

it was not necessary to accord ▐ particular form of hearing on the ▐ for the confinement.

After receiving the record up░ mand, we conducted a hearing. I ▐ tion to receiving the plaintiff's te▐ ny, we admitted several uncontro▐ affidavits and all the available re░ records of the institutions at ▐ plaintiff had been confined. Foll▐ the receipt of briefs and request▐ findings, we requested further cla▐ tion of the defendants' immunity ▐ The Deputy Attorney General subi▐ an affidavit from defendant Wolf░ that affidavit was immediately co▐ verted in a letter from plaintiff's ▐ sel.[5] We thereupon summoned co▐ to a further conference, as the res▐ which we ordered a further hear░ such time as Mr. Wolfe, now ░ from the Pennsylvania correction ░ tem and living in West Virginia, ░ be available. On July 14, 1975, the░ ther hearing was held. Briefs we ░ mitted in the wake of the hearing ing the matter at long last ripe position.

▐ Plaintiff concedes that he adduced sufficient evidence to s▐

**3.** The time lapse of approximately one and one half years between Judge Body's opinion granting summary judgment and the disposition of the appeal is explained by the following sequence of events. Plaintiff's appeal was filed on September 15, 1972. By letter dated August 10, 1973, the Court of Appeals drew counsel's attention to the fact that Judge Body granted summary judgment in favor of defendants Prasse and Rundle alone, without specific direction pursuant to Fed.R.Civ.P. 54(b) making it final as to all parties, and indicated an intention to dismiss the case for want of an appealable order, but invited suggestions as to alternative remedies. Counsel for both plaintiff and defendants conferred, and, noting that defendant Wolfe was not originally a defendant but was ordered joined (pursuant to plaintiff's motion) in the text of Judge Body's opinion and order, which also granted summary judgment, agreed that Judge Body intended that Wolfe not only be joined as a defendant but also as an additional party to the then outstanding motion for summary judgment. The parties thereupon filed a joint motion to correct an error in the record. By order dated September 19, 1973, the Court of Appeals ordered that the joint motion to correct the

record be denied, but granted the alternative motion requesting permission to move in the district court for this correction, pursuant to Fed.R.Civ.P. 60(a). The Court of Appeals retained jurisdiction of the cause and ordered that whatever action was taken by the district court be promptly certified back to it. Thereafter, the parties jointly moved in this Court to correct the omission in the original order. By this time, Judge Body had died, and the matter was reassigned to our docket. On October 29, 1973, we granted the joint motion to correct the error in the record and amended it to read that summary judgment was also granted in favor of defendant Wolfe.

**4.** *Meyers v. Alldredge*, 492 F.2d 296 (3d Cir. 1974); *Braxton v. Carlson*, 483 F.2d 933 (3d Cir. 1973); *and Biagiarelli v. Sielaff*, 483 F.2d 508 (3d Cir. 1973); *see also Gray v. Creamer*, 465 F.2d 179 (3d Cir. 1972); *United States ex rel. Tyrrell v. Speaker*, 471 F.2d 1197 (3d Cir. 1972).

**5.** Pursuant to our court order of July 25, 1974, the defendants were permitted to amend their answer to include the immunity defense which they inadvertently omitted from their earlier pleadings.

verdict for damages against defendants Prasse and Rundle;[6] *i. e.,* he has failed to demonstrate their acquiescence in, knowledge of, or accountability for plaintiff's confinement to administrative segregation. *Bracey v. Grenoble,* 494 F.2d 566 (3d Cir. 1974); *Curtis v. Everette,* 489 F.2d 516 (3d Cir. 1973); *Howell v. Cataldi,* 464 F.2d 272 (3d Cir. 1972). Accordingly, judgment must be rendered in their favor. See *Rizzo v. Goode,* —— U.S. ——, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). As to defendant Wolfe, however, plaintiff continues to assert liability, alleging that he has proved the necessary degree of involvement in deprivations of plaintiff's constitutional rights. Wolfe denies sufficient involvement to support liability, avers that plaintiff has failed to establish his equal protection and/or due process claims, and also claims immunity from suit for damages under the Civil Rights Act. For the reasons which follow, judgment must be entered for defendant Wolfe as well. This opinion constitutes our findings of fact and conclusions of law under Fed.R. Civ.P. 52(a).

## II. *Findings of Fact*

The State Correctional Institution at Graterford principally houses inmates who have been assigned to that institution for the duration of their terms of sentence. During the periods at issue here, Graterford also served to confine temporarily inmates (called "transferees") from institutions throughout the Commonwealth, when they were required to appear in litigation in or near Philadelphia. Due to their transiency and the diverse nature of their respective backgrounds, administrative problems arose regarding the mobility and privileges which transferees were to be accorded during their interim stays at Graterford. Accordingly, immediately upon receipt of the transferees from other institutions throughout the Commonwealth, they were placed in Cell Block "B" and were segregated from members of the general Graterford population. Inmates in "B" Block administrative segregation were accorded lesser privileges than the general prison population.[7]

The policy employed at Graterford upon the arrival of a transferee from another institution during the years in question was as follows. (As noted above, the procedure has been completely changed to conform to court decisions.) Shortly after a transferee's arrival, members of the administrative and treatment staffs examined and evaluated the transferee's background and prior performance record in institutions in order to determine the feasibility of releasing the transferee to the general prison population during his temporary stay at Graterford. As soon as (but only if) the administrative staff determined that a transferee's performance indicated that

---

**6.** During the period of time relevant to the facts underlying plaintiff's case, Prasse was the Commissioner of the Pennsylvania Bureau of Corrections; Rundle was the Superintendent at the Graterford State Correctional Institute; and Wolfe was the Deputy Superintendent at the Graterford State Correctional Institute.

**7.** At all·time relevant to plaintiff's case, inmates in "administrative segregation" on "B" Block were deprived of all rights to work at institution jobs. They could not enroll in vocational training programs or attend school. They were barred from movies and television and were not allowed to attend church services or Bible school classes. They wore special striped coveralls identical to those worn by inmates in "punitive segregation" (short-term punishment solitary confinement). Their

only exercise or recreation consisted of twenty-five or thirty minute periods on days when guards were available to watch them closely. During such periods, no running was allowed, nor were administrative segregation inmates permitted to play games or use athletic equipment. Exercise consisted of orderly walking. The prisoner spent approximately twenty-two hours a day in his cell, whereas members of the general population spent approximately twelve hours each day in their cells. "B" Block prisoners were fed only after the general prison population had completed their meals, and were restricted to three showers per week instead of the normal daily allowance. Finally, prisoners in administrative segregation status were allowed to remain with visitors for only thirty minutes, while general population residents were allowed visitation periods of as much as ninety minutes.

he would be likely to present no unacceptable disciplinary, management or security risk, he was released to the general population. However, if upon examination of a transferee's prior performance, his record indicated that he would be likely to cause friction in the general prison population or that he would be likely to present a discipline or security problem, such transferee was retained in "B" Block until such time as he was returned to his assigned institution.

Plaintiff's original incarceration following imposition of sentence was at Graterford, from September 25, 1967, until February 5, 1969. During his first nine months at Graterford, plaintiff's prison record showed no misconduct. However, commencing in June 1968, plaintiff committed a series of institutional infractions which led to his demotional transfer on February 5, 1969, from Graterford to the State Correctional Institution at Pittsburgh. This course of misconduct is important to this case and must be summarized.

On June 19, 1968, plaintiff was placed in punitive segregation for fifteen days for forgery and attempted larceny of another inmate's money. The reporting officer was the defendant in this case, Deputy Superintendent C. R. Wolfe. On July 12, 1968, less than a week after completing this punishment, plaintiff was again placed in punitive segregation for "insolence" and refusal to work. During his confinement in punitive segregation from July 12, 1968, until August 8, 1968, plaintiff accumulated an additional fifty-five reports of misconduct for refusing to obey prison regulations and stand for count. Upon completing this punishment on August 8,

1968, plaintiff was released back into the general prison population and apparently had no further trouble with prison authorities for six months, until January 9, 1969. On that date, he was assigned to the punitive segregation block again, this time for being part of a conspiracy with other inmates in refusing to do their assigned work.[8] During plaintiff's segregation between January 9, 1969, and January 20, 1969, he incurred an additional five misconduct reports for insolence and disrespect and refusing to obey institution regulations.

While this record of multiple misconduct during plaintiff's earlier incarceration at Graterford is heavily relied upon by the Deputy Attorney General in his justification of the retention of plaintiff in administrative segregation while a transferee at Graterford during 1970 (indeed he asserts that it is a conclusive justification), plaintiff relies upon the report of one particular incident during this stay in punitive segregation to support his claim of a personal animus toward him on the part of defendant Wolfe. On that occasion, January 16, 1969, plaintiff observed defendant Wolfe and other institution personnel attempting to remove another inmate from a nearby cell. Plaintiff testified that he objected to the use of chemical Mace on this inmate, and to the number of guards involved. The same day Wolfe cited plaintiff for "continu[ing] to make uncomplimentary remarks concerning methods used" to move inmates from one location to another. Wolfe alleged in his report that "[t]hese remarks were directed at myself and other officers present." As a result, plaintiff was sentenced to an additional thirty days in maximum security with no exercise.[9]

---

**8.** According to plaintiff, the actual incident giving rise to his assignment to the punitive segregation block was his refusal to clean a toilet with his bare hands and cleanser.

**9.** In further support of his contentions about defendant Wolfe's animosity towards plaintiff, plaintiff's counsel emphasized that all of plaintiff's assignments to punitive segregation were the result of findings of guilt at Behavior Clinic hearings over which Mr. Wolfe presided,

and that the January 16, 1969, incident resulted in a more severe punishment than other, more serious, infractions of prison rules by plaintiff, e. g., the attempted larceny incident. Although Wolfe was, indeed, the "chairman" at Behavior Clinic hearings, other employees of the institution (the Major of the Guards, at least one psychiatrist and at least one social worker) regularly attended hearings and had a vote equal to that of Wolfe. When questioned regarding the Behavior Clinic proceedings con-

Plaintiff never completed this thirty day sentence at Graterford, for on February 5, 1969, he was demotionally transferred to the State Correctional Institute at Pittsburgh.[10]

Plaintiff remained at Pittsburgh for almost a year. During this period he committed no reported infractions of institution rules, held a steady job and participated in a rehabilitative program. On January 21, 1970, plaintiff was transferred from Pittsburgh back to Graterford to facilitate pending court appearances in Philadelphia. Upon his arrival at Graterford, plaintiff was assigned to "B" Block in accordance with institution policy regarding the placement of transferees. On January 26, 1970, he was interviewed by members of the Graterford Administrative Staff. One of the members of that staff, Director of Treatment Walter F. Bruckno, advised plaintiff that because of his prior "agitation and noncooperation" with the staff at Graterford, the Administrative Staff decided that he should be retained in "B" Block.

Wolfe was not a member of the Administrative Staff which initially decided that plaintiff would be remanded to administrative segregation during his stay as a transferee at Graterford. That body normally comprised from four to eight prison officials and at any given interview or hearing generally included at least one psychiatrist, one social worker, the Major of the Guards, the Director of Correctional Industries at the prison, and the Director of Treatment (at that time Walter F. Bruckno). Wolfe, as Deputy Superintendent, had no individual authority or power to review the decisions of the Administrative Staff; its head was the Director of Treatment at the institution, a position equal in rank to that of Deputy Superintendent and subordinate only to the Superintendent of the institution.

As the weeks went by, plaintiff noticed that other transferees were being released to the general prison population. Plaintiff testified that he thereupon began submitting request forms to various officials, including defendant Wolfe, regarding his own release from segregation. According to plaintiff, the only response he received was a visit to his cell from defendant Wolfe, who told plaintiff that "he did not want him in his population." Plaintiff testified that he received no further hearings or interviews for the balance of his Graterford stay, which ended with his retransfer to Pittsburgh on July 7, 1970. On the other hand, defendant Wolfe testified that transferees who had been on "B" Block for thirty days were accorded hearings before the Behavior Clinic to determine whether they should be released to the general prison population. Review hearings, he testified, were held every thirty days thereafter. No description of these hearings was offered. Wolfe had no specific recollection of any such hearing being accorded to plaintiff, and the prison records do not reveal any (if indeed such matters are recorded, on which point there is also no evidence). As noted above (see note 9) Wolfe presided over Behavior Clinic hearings, although he had no more vote than the other members. The record, unfortunately, is also not clear as to whether it was Wolfe's responsibility to call Behavior Clinic hearings. We credit plaintiff's testimony that he was not brought personally before the Behavior Clinic for a further hearing. There was no evidence, and thus we cannot speculate, on how subsequent consideration was given to plaintiff's classification. As mentioned in Part I of this opinion, however, plain-

cerning plaintiff at the hearing before us, Wolfe stated that he had no recollection of them, as the normal practice was to hold twelve to twenty-five such proceedings per day. It is, of course, just as reasonable to conclude that plaintiff was accorded a more lengthy sentence for the January 16, 1969, infraction due to the Behavior Clinic's determination that it was of a more serious nature.

10. Plaintiff also attributes his transfer to Wolfe's animus arising from the incident on January 16 and not, as defendants allege, to the seriousness of the misconduct report on January 9.

tiff cannot raise a *procedural* due process claim in this case, so that question of "how" is immaterial. The important question is *whether* defendants had a reason to retain plaintiff in administrative segregation. As more fully set out in Part III.C. below, we find that they did and that this reason was sufficient and valid.

Plaintiff contends that the real reason for his administrative segregation during the entire five and one half months spent at Graterford while awaiting court proceedings in Philadelphia was the defendant Wolfe's personal and unwarranted animus against him—a residue of personal animosity remaining from plaintiff's earlier stay at Graterford. In support of this conclusion, plaintiff points to the fact that other transferees in or proximate to the January 21, 1970 group, with prior misconduct records as bad as or worse than plaintiff's, were released into the general prison population soon after arrival at Graterford. For instance, plaintiff points out, Frederick Scott, who was transferred to Graterford on the same day as plaintiff and originally placed in "B" Block, was transferred to "C" Block and assigned an institution job only three weeks later, on February 11, 1970. Prior to his temporary transfer to Graterford, Scott had been incarcerated at the State Correctional Institution in Huntingdon. While incarcerated there, Scott had been cited and disciplined for interfering with inmates, going through the early dinner line, fighting with one inmate, assaulting another with a sixteen inch steel pipe, refusing to perform assigned work, destroying state property and disturbing his cell block. (Plaintiff's Exhibit I: Work and Quarters Assignment Record and Conduct Record).

Plaintiff also points to the case of Alexander McCant. McCant was also received at Graterford for a court case on January 21, 1970, as a temporary transfer from Huntingdon and was initially placed on "B" Block. While at Huntingdon, McCant had been disciplined for disobedience of orders, being in an unauthorized area and suspicion of sexual conduct. On February 4, 1970, McCant was placed in "C" Block and assigned to an institution job at Graterford. (Plaintiff's Exhibit 2: Conduct Record and Work and Quarters Assignment Record).

As a third example of the unequal treatment accorded him, plaintiff points to the case of Isaiah Green. Green was received at Graterford sometime between February 17 and February 26, 1970, for a court case as a temporary transfer from the State Correctional Institution at Rockview. Prior to his incarceration at Rockview, Green had been imprisoned at Graterford and during that period he had been cited and disciplined for refusing to return to work throwing paper out of a widow, possession of contraband pool tickets and cigarettes, fighting with another inmate, creating a disturbance in the dining room, possession of obscene literature, inciting and leading a riot, and assaulting other inmates and institution officials. Green had been demotionally transferred from Graterford. Nevertheless, on February 26, 1970, Green was transferred to "A" Block and assigned an institution job at Graterford. (Plaintiff's Exhibit 3: Work and Quarters Assignment Record, Cumulative Adjustment Record, Supplemental Sheet for Misconducts, and Reclassification Summary).

Defendants do not dispute the foregoing facts, but counter that plaintiff was not treated differently from any other inmate who was being held on "B" Block. They argue that of the eight other inmates who were transferred to Graterford on the same day as plaintiff, none, with the exception of plaintiff and James Johnson, had ever been given a demotional transfer from Graterford to any other institution. Of the two inmates who had been given a demotional transfer from Graterford and were temporarily retransferred back to Graterford to appear in Court, both Johnson and plaintiff remained in administrative segregation for the duration of their stay. Defendants distinguish the case of Isaiah Green on other grounds. Green, although at one time demotionally transferred from Graterford, had been away

from that institution for a four year period, and during that period he had been transferred to the State Correctional Institution at Rockview, a minimum security prison. Upon his temporary transfer back to Graterford, Green evidenced a desire to retransfer as a permanent resident to Graterford and disclaimed his previous behavior as "water over the dam." (Defendants' Exhibit 6). Although Alexander McCant had a poor disciplinary record at Huntingdon and was assigned to an institution job at Graterford shortly after his transfer to that institution, McCant had never been incarcerated at Graterford prior to his temporary transfer there. Five days after being assigned an institution job, McCant was returned to administrative segregation for an infraction of institutional rules and regulations, and remained in administrative segregation until he was returned to Huntingdon on April 23, 1970. Thereafter, on April 29, 1970, McCant was retransferred to Graterford as a temporary transferee. During his second stay at Graterford, McCant remained in administrative segregation. (Defendants' Exhibits 2 and 8). Finally, defendants add that George Armstrong, another inmate who had been temporarily transferred to Graterford and who had an excellent record at the State Correctional Institution in Huntingdon (indeed, he was frequently outside the institution while at Huntingdon), was also placed in administrative segregation upon his arrival as a temporary transferee at Graterford and advised that he would remain there until he was returned to Huntingdon. (Defendants' Exhibit 5). These facts relied upon by defendants are also uncontroverted.

In order to evaluate the claim of animus, it is instructive to retrace Wolfe's involvement in plaintiff's case from the time plaintiff was originally incarcerated at Graterford. Plaintiff incurred nearly sixty misconduct citations at Graterford. Of these, Wolfe was personally responsible for citing plaintiff for two of the most serious. These two charges led to ultimate findings of guilt at hearings before the Behavior Clinic of which Wolfe was the presiding member, although his was only one of four or more votes (see note 9 supra). At the hearing before us, Wolfe testified that he did not feel, nor had he ever felt, any animosity toward plaintiff. In fact, Wolfe did not recollect ever having cited plaintiff for infractions of prison rules. Neither did he recollect visiting plaintiff's cell and informing plaintiff of his desire not to have him in the general prison population during the five and one half months that plaintiff spent as a transferee on "B" Block.

Even if we were to accept plaintiff's testimony that Wolfe visited his cell and told him that he did not want him in the general population, that statement—bare of any evidence of why Wolfe felt that way—is equally consistent with a finding that Wolfe had no animosity, but was merely informing plaintiff of the Behavior Clinic's decision. However, we credit Wolfe's testimony and find that Wolfe bore no animosity toward the plaintiff.

III. *Plaintiff's Constitutional Claims*

A. *Participation of Defendant Wolfe*

Plaintiff has conceded that he has no cause of action against defendants Prasse and Rundle for failure to demonstrate their participation or knowledge and acquiescence in plaintiff's confinement to administrative segregation. Defendant Wolfe similarly argues that plaintiff has introduced no facts which would show that he participated in any way to violate the plaintiff's constitutional rights. See *Rizzo v. Goode*, ——— U.S. ———, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095 (1976). Three recent decisions, *Bracey v. Grenoble*, 494 F.2d 566 (3d Cir. 1974); *Curtis v. Everette*, 489 F.2d 516 (3d Cir. 1973); and *Howell v. Cataldi*, 464 F.2d 272, 282–85 (3d Cir. 1972), explicate the degree of involvement in a constitutional violation that may render a defendant liable for damages under § 1983. These cases require proof of participation or knowledge and acquiescence in the allegedly offending conduct. Wolfe was not involved in the

initial decision to place plaintiff in administrative segregation,[11] nor did he have individual or sole power or responsibility to alter plaintiff's status thereafter. However, the proven personal connection of Wolfe to the facts alleged to establish the constitutional violation does arguably rise to the degree of involvement required by the Court of Appeals in *Howell, Curtis,* and *Bracey,* to state a cause of action under § 1983. Accordingly, we now consider plaintiff's constitutional claims with regard to action taken by defendant Wolfe.

### B. *Plaintiff's Equal Protection Claim*

Plaintiff alleges that he was relegated to continuing administrative segregation, while other transferees with equally bad prior conduct records were released into the general population. Plaintiff argues that the record on this issue justifies our finding a denial of his constitutional right to equal protection of the laws on either of two legal theories. First, plaintiff contends that the prima facie showing that he was accorded harsher treatment than another individual identically situated establishes, without more, a violation of equal protection. Alternatively, plaintiff contends that his prolonged confinement in segregation was prompted by the personal animosity of defendant Wolfe and that such *specific* discrimination constitutes a denial of equal protection. Plaintiff argues that Wolfe had irrationally identified the plaintiff as a "troublemaker" and bore a strong personal animus toward him due to his criticism of Wolfe's methods in extricating another inmate from a nearby cell.[12]

In reversing Judge Body's prior grant of summary judgment and remanding the case on this point, the Third Circuit held:

> Plaintiff [alleges] sufficient facts that, if proven, would entitle him to judgment on [the equal protection] claim.
>
> . . .
>
> [fn.] Plaintiff, after describing his own treatment, states the treatment received by at least one other prisoner and claims that no basis exists for distinguishing that prisoner's conduct from plaintiff's, except insofar as plaintiff might thereby be entitled to better treatment.

*United States ex rel. Bennett v. Prasse,* No. 72–1961 (3d Cir., March 26, 1974), at 3. This statement of equal protection doctrine is the binding law of this case. See also *Fischer v. Cahill,* 474 F.2d 991, 993 (3d Cir. 1973). While the Third Circuit's memorandum does not contain an express statement of constitutional principle, we read it as alluding to the proposition articulated in *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). In *Snowden,* the plaintiff alleged that state officials willfully and maliciously refused to certify him as a candidate for public office even though he qualified himself for nomination. In affirming a dismissal of the complaint, the Supreme Court stated:

> The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be

---

11. At the hearing before us, defendant Wolfe testified that he lacked authority to revise or review the decisions of the Administrative Staff regarding the retention of transferees on "B" Block. We have already indicated that we credit that testimony and, accordingly, we reject plaintiff's arguments that the Administrative Staff, and particularly Mr. Bruckno, were in fact acting under the direction of Mr. Wolfe as regards plaintiff.

12. We note, at this juncture, that we do not understand plaintiff to have alleged a deprivation of his constitutional right to equal protection arising from the distinctions in treatment between temporary transferees with prior misconduct records and those with exemplary histories. Nor does he allege a similar deprivation arising from the differences in treatment accorded to transferees and the general prison population. Had such questions been before us, we would have been disposed to test these actions under the "rational relationship" test which is appropriate for determining whether there has been a denial of equal protection arising from actions taken toward a non-suspect *class. McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *but see Bolling v. Manson,* 345 F.Supp. 48, 51 (D.Conn.1972) (3-Judge Court).

present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person [citation omitted], or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself [citation omitted]. But a discriminatory purpose is not presumed [citation omitted]; there must be a showing of 'clear and intentional discrimination' [citations omitted].

321 U.S. at 8, 64 S.Ct. at 401.

■ While the Third Circuit's ruling in this case did not mention the additional element of "discriminatory design," we read it in to avoid turning every instance of official failure to abide by state law into a federal constitutional violation. See dissenting opinion of Adams, J. (3d Cir.), in *Tyler v. Vickery,* 517 F.2d 1089, 1106 (5th Cir. 1975). On the other hand, both *Snowden* and the Third Circuit's order in this case make clear that there *is* such a thing as an individual (as opposed to class-wide) denial of

equal protection.[13] Such an individual denial could be demonstrated by proof of animus or by showing that the state action was taken in retaliation for the exercise of a fundamental right.[14] In this case, however, we need not reach this question of motivation, for our factual findings demonstrate that the treatment plaintiff received was not different from that afforded anyone similarly situated. As set out in Part II above (*see* detailed exposition *supra*), the Commonwealth justified and distinguished the release from segregation of each other inmate pointed out by plaintiff on the basis of such factors as (1) absence of a recent demotional transfer from Graterford; or (2) an independent determination as to whether the transferee would create a disciplinary, management or security problem at *Graterford* (as opposed to another, different institution). It cannot be said that the distinctions drawn between plaintiff and these other cases were insignificant, arbitrary or irrational. Indeed, the reasonableness of the administration's distinguishing between inmates who had bad records at Graterford and those who misbehaved else-

**13.** Defendants maintain, however, that since plaintiff alleges that he was individually discriminated against, he has failed to state a claim under § 1983. To support this contention, they rely on the decision of the Supreme Court in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), which they interpret as holding that in the absence of a showing of class based discrimination plaintiff's claim of a denial of equal protection under the Civil Rights Act must fail. Not only does the defendants' position fly in the face of the law of this case, it grievously misconstrues *Griffin.* That case expressly concerned suits commenced under 42 U.S.C. § 1985(3). Plaintiff's complaint, of course, alleges a cause of action under 42 U.S.C. § 1983, and this obvious distinction disposes of the *Griffin* argument. The crux of *Griffin* was the holding that § 1985 contemplated actions for recovery following deprivations by private conspiracies. 403 U.S. at 101, 91 S.Ct. 1790. One of the potential consequences of this construction was the opening of federal courts to "constitutional" tort actions against private citizens. The "constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law," 403 U.S. at 101, 91 S.Ct. at 1798, were avoided by giving full effect to the congressional purpose for enacting that partic-

ular section. Thus, the Court additionally imposed the requirement of a class based, invidiously discriminatory animus with regard to § 1985(3) suits. Since *Griffin* dealt with a statutory provision not here under consideration, it is of minimal relevance to the claims in this case. Further, such prophylactic measures as those taken by the Court in *Griffin* are not necessary for § 1983 actions. Since § 1983 complaints are restricted to deprivations worked by persons acting under color of state law, there can be no comparable fear of a torrent of "constitutional" suits alleging common law torts involving private citizens.

**14.** *Compare Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962) (mere exercise of selectivity in enforcement is not unconstitutional), *with United States v. Falk,* 479 F.2d 616 (7th Cir. 1973) (selectivity exercised *so as* to burden free exercise of religion); *United States v. Steele,* 461 F.2d 1148 (9th Cir. 1972) (freedom of speech); *and Burt v. City of New York,* 156 F.2d 791 (2d Cir. 1946) (L. Hand, J.) (personal hostility). The "burden of proving intentional or purposeful discrimination is placed upon" the moving party. *Cf. United States v. Berrigan,* 482 F.2d 171, 174 (3d Cir. 1973) (criminal prosecution).

where is demonstrated by plaintiff's own case. He fared poorly at Graterford during 1968–69, but apparently had no trouble at Pittsburgh. Moreover, plaintiff has not alleged that his relegation to segregation was inspired by his exercise of any fundamental right, and he has not succeeded in proving that the acts of Wolfe in acquiescing to his prolonged retention in administrative segregation were intended to discriminate against the plaintiff. In fact, we have found from Wolfe's testimony and affidavit that his acquiescence was based on his reasonable estimation that plaintiff was a disciplinary and management risk. We find no evidence that plaintiff was arbitrarily classified or unjustly retained on "B" Block due to the personal animus of defendant Wolfe. Accordingly, we hold that no purposeful discrimination has been proven, and plaintiff's equal protection claim must fall.

### C. Plaintiff's Due Process Claim

Plaintiff contends that his indefinite commitment to administrative segregation and his retention there without review of the present threat he posed, in light of his exemplary record at the State Correctional Institution at Pittsburgh and his compliance with prison rules while a transferee, constituted a deprivation of liberty without due process of law. When the Court of Appeals remanded this case, it urged that plaintiff's due process claim be considered in the light of recent decisions on related issues.[15] These decisions have now been essentially supplanted by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), however, and that case holds itself non-retroactive. *Id.* at 573–74, 94 S.Ct. 2963. The events here

in issue occurred before the relevant Third Circuit cases were decided and long before *McDonnell;* hence, plaintiff cannot recover damages for any violation of specific procedural due process guarantees.[16] What remains, however, is his claim that he was denied *substantive* due process.

■■ As the Supreme Court defined this concept in *McDonnell*: "The touchstone of due process is protection of the individual against arbitrary action of government." 418 U.S. at 558, 94 S.Ct. at 2976.[17] In the leading case on the meaning of the phrase "due process of law," a unanimous Supreme Court declared some ninety years ago:

> Law is something more than mere will exerted as an act of power. . . . Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law
>
> . . . . .

*Hurtado v. California,* 110 U.S. 516, 535–36, 4 S.Ct. 111, 121, 28 L.Ed. 232 (1884). Ruling on a case presenting the same situation as this one, the United States Court of Appeals for the Eighth Circuit held recently:

> While . . . administrative segregation is not inherently unconstitutional, its validity depends . . . in individual cases upon the existence of a valid and subsisting reason or reasons for the segregation . . . . . It goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate or desires to punish him for

---

15. *See* note 4 *supra.*

16. Since plaintiff's complaint was filed, moreover, the Bureau of Corrections in Pennsylvania has issued new guidelines for all state correctional facilities. These regulations, which took effect on November 1, 1972, reflect a careful effort to comport with the Third Circuit's position in *Gray. See also Bauer v. Sielaff,* 372 F.Supp. 1104 (E.D.Pa.1974); *United States ex rel. Neal v. Wolfe,* 346 F.Supp. 569 (E.D.Pa.1972).

17. For the purposes of applying the due process clause, we see no distinction between the "punitive" measures litigated in *McDonnell* and the "administrative" segregation at issue here. Plaintiff's "liberty" was equally impinged upon. *See, e. g., Carlo v. Gunter,* 520 F.2d 1293, 1295–96 (1st Cir. 1975); *Gomes v. Travisono,* 510 F.2d 537, 541 (1st Cir. 1974); *United States ex rel. Lewis v. Johnson,* 383 F.Supp. 600, 604 (E.D.Pa.1974), *reconsideration denied,* 393 F.Supp. 312 (E.D.Pa.1975).

past misconduct. Moreover, it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future.

*Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975). The plaintiff can thus prevail only if he has shown that he was relegated to administrative segregation for no reason at all or for an invalid, invidious or unsupportable reason. *Cf. O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (mentally ill person may not be indefinitely confined without adequate justification, *i. e.*, finding of dangerousness). The defendants here explained both their initial and their continuing decisions to confine the plaintiff to administrative segregation, and the plaintiff has not shown those decisions to be unreasonable or otherwise invalid. Accordingly, we deny his claim on this ground as well.

To buttress his position, plaintiff relies primarily on *Allen v. Nelson*, 354 F.Supp. 505 (N.D.Cal.), *aff'd per curiam*, 484 F.2d 960 (9th Cir. 1973), and *Tyrrell v. Taylor*, 394 F.Supp. 9 (E.D.Pa.1975). The differences between those cases and this one, however, only serve to clarify our ruling. In *Allen*, the plaintiff had been a suspect in the murder of a guard at Soledad Prison. He was transferred to San Quentin and placed in administrative segregation. When the murder charges were dismissed, however, his temporary segregation turned into indefinite retention in solitary, supported only by vague assertions that he was a "black militant," a "revolutionary," and "disruptive, hostile, aggressive, and potentially assaultive." 354 F.Supp. at 509. He was retained in segregation despite two separate recommendations by the Classification Committee that he be released to the general population. In addition, the court noted that "there was no showing that [the plaintiff] participated in a pro-

hibited prison activity, or committed regulatory infractions, or was involved in overt problem behavior, any of which activities might support continued confinement." 354 F.Supp. at 513.

In *Tyrrell v. Taylor*, plaintiff had been placed in administrative segregation because he was a pretrial detainee and not because he was determined to be a management problem or security risk. Judge Huyett held that keeping a pretrial detainee under conditions significantly more restricted than those of the general prison population violated the due process clause. In *Kelly v. Brewer*, *supra*, the recent Eighth Circuit case on prolonged administrative segregation, the two plaintiffs were assigned to permanent isolation after serious attacks, one of them fatal, on prison personnel. No meaningful reconsideration of these decisions was ever given, so that the prison administration would never know whether the plaintiffs were still security risks or whether it had become safe to return them to the general population.

The common and decisive factor in those cases was the absence of a valid, subsisting reason for the continuing solitary confinement. Unlike *Tyrrell*, this case does not involve a uniform, inflexible policy unresponsive to individual cases. Unlike *Allen*, the reasons given here were factual and rationally related to prison administration, not vague, conclusory, racial or political. The prison administrators in *Kelly*, unlike those here, gave no reason at all to leave undisturbed an initial decision to segregate. Such was not the case with plaintiff. The testimony presented in this case showed that plaintiff was segregated on "B" Block because of his recent record of noncooperation with the staff at Graterford. In support of this, the defendants introduced plaintiff's disciplinary record at Graterford for the period between September 25, 1967, and February 5, 1969, culminating in his "demotional" transfer to the State Correctional Institution at Pittsburgh. The Administrative Staff made the determination that plaintiff would create disciplinary and management problems if released into

the general prison population. We cannot say that that decision was irrational or invidiously motivated, or that the justification must have dissipated over a five month period. The plaintiff is thus entitled to no relief on this ground, for the defendant's actions satisfied the minimal demands of substantive due process.

## D. *Conclusion*

Since we find no violation of plaintiff's constitutional rights has been proved, we have no occasion to resolve the difficult immunity issues which were ably briefed by the parties. See *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Goode v. Rizzo,* 506 F.2d 542, 549–50 (3d Cir. 1974), *rev'd on other grounds,* —— U.S. ——, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095 (1976); *Fidtler v. Rundle,* 497 F.2d 794 (3d Cir. 1974).

In accordance with the foregoing opinion, judgment will enter for all defendants and against the plaintiff.