Clarence **MORRISON**, Plaintiff,

v.

Barry **FOX**, Individually, and as a Detective in the Pittsburgh Police Department; Paul DeMaio, Individually, and as a Detective in the Pittsburgh Police Department; Glenn Hores, Individually, and as a Detective in the Pittsburgh Police Department; Bernard Ciganek, Individually, and as a Detective in the Pittsburgh Police Department; Tim Regan, Individually, and as a Detective in the Pittsburgh Police Department; William Hahalyak, Individually, and as a Detective in the Pittsburgh Police Department; Stephen P. Joyce, Individually, and as the Assistant Superintendent of the Pittsburgh Police Department; and The City of Pittsburgh, a municipal corporation, Defendants.

Civ. A. No. 77–1156.

United States District Court,
W. D. Pennsylvania.

Dec. 18, 1979.

Sanford M. Aderson, Aderson, Frank & Steiner, Pittsburgh, Pa., for plaintiff.

A. Bryan Campbell, Mansmann, Beggy & Campbell, Pittsburgh, Pa., for individual Detective defendants.

Arthur G. Gilkes, Jr., Pittsburgh Law Department, Pittsburgh, Pa., for Asst. Superintendent Joyce and City of Pittsburgh. .

## OPINION

SNYDER, District Judge.

This Section 1983 action by Clarence Morrison against the City of Pittsburgh, the Assistant Superintendent of Police, and six members of the Detective Division of the Pittsburgh Police Department seeks damages for unlawful arrest. We find in favor of Morrison only as against the six Detectives and judgment will be entered accordingly.

### I. *Findings of Fact*

1. The Plaintiff, Clarence Morrison, is a citizen of the United States and a resident of R.D. # 1, Punxsutawney, Pennsylvania.

2. The individual Defendants are all residents of the City of Pittsburgh and members of its Police Department.

3. The individual Defendants at all times were Police Officers of the City of Pittsburgh, County of Allegheny, a governmental subdivision of the Commonwealth of Pennsylvania.

4. Jurisdiction of the court is by virtue of Title 28, United States Code, Section 1343.

5. At all times material, all named police officers were acting under color of their official capacity and their acts were performed under color of the ordinances of the City of Pittsburgh and statutes of the Commonwealth of Pennsylvania.

6. On May 20, 1977, at about 11:30 A.M., the wife of Defendant Detective Barry Fox informed her husband she had been assaulted in their home by a unknown white male. The intruder, accompanied by Coleen Fox, Barry Fox's former wife, abducted Fox's son, Sean.

7. There was a pending custody matter in the local courts at that time which had not been resolved.

8. Barry Fox immediately went to his home and observed that his wife, Lynda Fox, had received bruises and contusions in the ensuing scuffle, and that a two inch thick wooden door had been extensively damaged. Lynda stated to Barry that the child was taken away in a maroon colored Ford Mustang containing four people described as two women, a white male, and another male wearing a white hat.

9. About 2 P.M. on May 20, 1977, Detective Fox proceeded to the Office of City Magistrate Stephen Laffey, and after describing the offenses to the Magistrate, the Magistrate typed out criminal complaints which Barry Fox signed against Coleen Fox, John Doe and Jane Doe, charging Kidnapping, Section 2904, Burglary, Section 3502, Aggravated Assault, Section 2702, and Conspiracy, Section 903 of the Criminal Code of the Commonwealth of Pennsylvania.[1]

---

1. The Criminal Complaint stated in part:

"The acts committed by the accused were: Kidnapping-2901, 2904 Burglary-3502 Agg. Aslt-2702 Consp-903. That on or about May 20, 1977, in the County of Allegheny, unlawfully and feloniously did then and there remove another a substantial distance under the circumstances from the place where he is found and did unlawfully confine another for a substantial period of time, to-wit: Said actress did take one Sean Timothy Fox from his residence of 2112 Lucana Street. That on or about May 20, 1977, in the County of Allegheny, unlawfully and feloniously did then and there enter a certain building or occupied structure and separately secured or occupied portion thereof belonging to one Linda Fox and situate at 2112 Lucana Street, in the City of Pittsburgh with intent to commit a crime therein, to-wit: the crime of Kidnapping. That on or about May 20, 1977, in the County of Allegheny, unlawfully and feloniously did then and there intentionally, knowingly and recklessly cause serious bodily injury to the person of one Linda Fox, under circumstance manifesting extreme indifference to the value of human life. That on or about the 20th day of May 1977 and at divers[e] other times within 2 years last past with intent or promoting or facilitating the commission of the crime of Kidnapping and Burglary, unlawfully and feloniously did agree with JOHN DOE JANE DOE and Coleen Fox that they or one or more of them would engage in conduct which would constitute such crime or crimes or an attempt or solicaition [sic] to commit such crime, and did an overt act in pursuance thereof to-wit: Said actor conspired with JOHN DOE, JANE DOE, Coleen Fox to commit the crime of Kidnapping, Burglary.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of 2901—3502—2702—903 and ____ of the Act 2904

10. Magistrate Laffey then issued warrants of arrest and it was these warrants which were in the possession of the officers at the time of their entry of Sunny Jim's Restaurant and Bar, 255 Camp Horne Road in Kilbuck Township, Allegheny County, Pennsylvania.

11. Detective Fox had been alerted to the fact that the maroon Mustang was at Sunny Jim's parking lot by his father, who had recalled a previous incident, approximately one year before, in which a Coleman Mulkerrin was also involved in a custody matter, and Detective Fox was lead to believe that Mulkerrin may have been involved in the abduction of his son Sean.

12. Detective Fox was directed by his superior, Detective DeMaio, to leave his weapons at the police station, but was given permission to accompany the other detectives herein named to Sunny Jim's Restaurant and Bar, outside the City limits.

13. The Detective Defendants, Fox, DeMaio, Hores, Ciganek, Hahalyak and Regan, then proceeded to the area of Kilbuck Township and met two officers from the Borough of Emsworth and a police officer from Kilbuck Township near the restaurant, the latter three officers accompanying the Pittsburgh Detectives, but taking no part in the investigation.

14. Upon arrival at Sunny Jim's parking area, the Detectives observed a maroon Mustang with the license plate bent up which corresponded with the description given by Lynda Fox that although she had gone into the street to get the license number, she had been unable to do so because the license plate had been bent. The Detectives bent down the license plate, took the number, and verified the ownership of the vehicle as being that of Clarence Morrison.

15. On May 20, 1977, at approximately 4:30 P.M., Plaintiff Clarence Morrison was patronizing Sunny Jim's Restaurant and Bar.

of 1973 or the _____ Ordinance of the City of Pittsburgh."

16. In the meantime, Detectives Hores, DeMaio, Fox and Ciganek entered the bar, identified themselves as police officers and/or detectives, and upon inquiry as to whom the maroon Mustang belonged, Clarence Morrison volunteered that he was the owner of the vehicle. Morrison was dressed in levis, boots and a shirt, and was wearing a brown hat. Morrison then accompanied the Detectives into the parking lot for questioning and, after being advised of his rights,[2] Morrison and his vehicle were searched.

17. There, in the presence of the Detectives, Morrison first stated he knew nothing about the incident and could not possibly have been involved since he had been working all that day at a housing construction project within three or four miles of Sunny Jim's. Upon further questioning, he said his vehicle might have been involved since it was necessary to park it with the keys in the car at the construction site so that it could be moved if it was obstructing traffic or workers on the construction site. He also stated that he had loaned his car to his employer, Coleman Mulkerrin, who had asked to use it for a short time that morning, but stated he had not seen Mulkerrin in the vehicle, had not seen him leave, nor did he know how long he had the vehicle, nor did he see him return with the car.

18. Morrison then indicated he was willing to cooperate with the police as he had nothing to hide, and said he would go to the police station.

19. At approximately 4:30 P.M., Morrison was told he was in trouble, that he would have to come with the police officers, was handcuffed and placed in the back seat of a police car by Detectives DeMaio and Hores, who instructed Detectives Hahalyak and Regan to take him to the Public Safety Building. These Detectives took over custody of Morrison and arrived at the Public Safety Building at about 6:30 P.M.

20. Upon arrival at the Public Safety Building, Morrison was turned over to the

2. Detective Hores testified credibly that he had advised Morrison of his rights while in Sunny Jim's Restaurant and Bar.

turnkey and incarcerated in a holding cell for an hour and a half to two hours. A statement was taken by another officer in which Morrison gave substantially the same information as he had given previously, that he had loaned his car to Mulkerrin and that was all he knew about the incident. Morrison was thus in custody for a total of approximately four hours.

21. In the meantime, Mrs. Morrison had contacted an attorney, Lisle Zehner, Esq., and the attorney, in attempting to find out whether or not Clarence Morrison was incarcerated, made some five or six telephone calls to various police telephone numbers before finally being put in touch with Morrison at the Public Safety Building. Mr. Zehner described his contacts with the Police Department as a "conspiracy of silence".

22. When Zehner first contacted Detective Fox that night he said he would file a suit for immediate release.

23. However, at approximately 8 P.M., Zehner was told that Morrison was at the Public Safety Building, was not under arrest, and could leave any time. He thereupon spoke with Morrison and told him to leave immediately. Morrison had previously been told he would be driven back to Sunny Jim's, but when no ride was offered, he got a cab at approximately 10 P.M., went back to Sunny Jim's to pick up his car, and proceeded to his home.

24. Zehner was contacted the next day by Detective Fox to see if the matter could be straightened out, but no resolution was reached.

25. As time went on, Morrison's children heard rumors that he had been "busted" in a drug raid (some of the Detectives involved were from the Drug Enforcement Division). Some three months later, although employed and earning $230 a week

with Coleman Mulkerrin, Morrison moved to the Punxsutawney area from his home in Emsworth, because he didn't want his children to believe their father was a "dope dealer".

26. Following his move to Punxsutawney, Morrison was out of work for eight months.

27. While at the Public Safety Building, Morrison was placed in a filthy, dark and bug infested cell for approximately one and a half to two hours and as a result of his confinement felt nervous. Other than this, no emotional distress or mental anguish of any kind was suffered by Morrison, nor was there evidence that the move to Punxsutawney was in any way directly related to the conduct of the officers in the incident set forth above, other than the rumors with which the Detectives had no connection.

28. In Sunny Jim's at the time of the incident were the bar maid, a Robert Murphy and his wife, who lived above the bar and who testified for Morrison at the hearing, two young people who were playing pool, and a Franny Reed. There was no evidence whatsoever that any of these persons ever spoke to the Plaintiff about the incident.

## II. *Discussion*

The Plaintiff bases a strong attack on the contention that the Detectives brought about an illegal arrest because under Pennsylvania law warrantless arrests are prohibited for misdemeanors committed outside the arresting officer's presence. The Plaintiff's theory is that the charges were later reduced before the Magistrate to criminal trespass, which is a misdemeanor, and that the officers under the circumstances knew that kidnapping, burglary and aggravated assault could not be sustained, that these charges were a mere sham, that the John Doe warrant was invalid,[3] and the arrest

---

3. Pa.R.Crim.P. 132 (Purdon, 1979 Pamphlet) states:

"Every complaint shall be substantially in the form set forth in Rule 133 and shall contain:

. . . .

(2) The name and address of the defendant, or if unknown, a description of him as nearly as may be; . . ."

The Criminal Complaint signed by Detective Barry Fox contained no description whatsoever and thus is clearly invalid. *Cf.* Fed.R.Crim.P. 4(c)(1), which states:

was also invalid. We do not, however, reach these questions, focusing on the good faith defense of the officers.

■ Section 1983 does not provide a remedy for common law torts. Instead, it creates a federal cause of action against those who "acting under color of state law" cause a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." It is the violation of Federal Constitutional rights which may be redressed, not the violation of state law.

As said by Justice Douglas in *Screws v. United States*, 325 U.S. 91, 108, 65 S.Ct. 1031, 1038, 89 L.Ed.2d 1495 (1945):

"But there is no warrant for treating the question in state law terms. The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under 'color of any law'."

*Cf. Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1973).

■ In *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), and *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), cited to us by the Plaintiff, the Supreme Court focused on the requirement of probable cause in determining whether warrantless arrests were constitutionally valid. However, in a 1983 action, the defendants may justify the arrest, if made in good faith and if the officers reasonably believe they have probable cause.

In *Brubaker v. King*, 505 F.2d 534, 536–37 (7th Cir. 1974) (Senior United States Circuit Judge William H. Hastie of the United States Court of Appeals for the Third Circuit, sitting by designation), stated:

"The Supreme Court has held, *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18

"(1) *Warrant.* The warrant shall be signed by the magistrate and shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty. . ."
The warrant would also be invalid under Federal law. *See U. S. v. Jarvis*, 560 F.2d 494 (2d Cir. 1977), *cert. denied* 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978).

L.Ed.2d 288 (1967), and has recently reaffirmed, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), that the defense of good faith and probable cause is available to police officers in a civil rights action based on § 1983. In *Pierson*, the Court explained how the two elements of good faith and probable cause were to be applied as a standard: '[I]f the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional.' 386 U.S. at 557, 87 S.Ct. at 1219. The test, thus, under § 1983 is not whether the arrest was constitutional or unconstitutional or whether it was made with or without probable cause, but whether the officer believed in good faith that the arrest was made with probable cause and whether that belief was reasonable.[1]

\* \* \* \* \* \*

1. This test is not inconsistent with our court's holding in *Joseph v. Rowlen*, 7 Cir., 402 F.2d 367 (1968). In *Joseph*, the plaintiff sued Police Officer Rowlen under 42 U.S.C. § 1983 for false arrest and imprisonment. Joseph had been arrested while approaching passersby on the street trying to sell pots and pans. He was arrested under a city ordinance proscribing soliciting from house to house, although Officer Rowlen admitted he knew 'soliciting didn't cover it.' 402 F.2d at 368. In *Joseph*, therefore, the defendant had no reasonable belief in the validity of the arrest. Under such circumstances, the court correctly held that inquiry into good faith was unnecessary. As we hold in the instant case, there is only a valid defense if the arrest was made both in good faith and with a reasonable belief in its constitutionality. Where one element of the test is clearly not satisfied, investigation into the other element need not be pursued."

■ In the instant situation, under the tests set forth above, we find that the actions of the officers were not taken in good

The Fourth Amendment directs that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." The test of reasonableness under the Fourth Amendment is objective rather than subjective. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889, 906 (1968).

faith and with a reasonable belief of probable cause. There were unusual circumstances in this case: Detective Fox's family was involved and no identifiable description was supplied to describe with particularity the John Doe involved, nor was any such description known except that an individual wearing a white hat was seen in a maroon Mustang with a bent license plate. In fact, the officers, by their testimony, made no attempt to justify their actions on the basis of the warrant, but contended they had not arrested Clarence Morrison. However, Detective Hahalyak said that Morrison had been turned over to him for transportation to the Public Safety Building and that, as far as he and his partner knew, Morrison was under arrest. He said Morrison was under their custody and they transported him to the Public Safety Building and turned him over to the turnkey who then put him in a holding cell. Under these facts, we find that Plaintiff Clarence Morrison was arrested.[4]

■ Plaintiff fails to prevail with respect to his claim against the City of Pittsburgh and Assistant Superintendent of Police, Stephen Joyce. Under *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 635 (1978), municipalities are subject to Section 1983 liability, although respondeat superior may not be the basis for Section 1983 relief. It is only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" that a municipality may be held liable. No such policy on the part of the City of Pittsburgh was shown here. Further, it has not been shown that Superintendent Joyce participated in or had knowledge and acquiesced in the arrest of Morrison. *See United States ex rel. Bennett v. Prasse,* 408 F.Supp. 988, 995 (E.D.Pa. 1976).

4. No charges were filed against Morrison, and the dispute between Fox and his former wife

## III. *Damages*

■ Plaintiff failed to offer very specific evidence on compensatory damages. Morrison's emotional distress and anguish was limited to incarceration in a filthy, dark and bug infested cell for a maximum of two hours and generalized feelings of nervousness, experienced as a result of this arrest and incarceration, of indefinite duration and intensity.

In *Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252, 265 (1978), a 1983 action involving the denial of procedural due process, it was held that compensatory damages would not be awarded without proof of actual injury, although nominal damages of one dollar would be appropriate.

In *Morrow v. Igleburger,* 584 F.2d 767, 769 (9th Cir. 1978), a damage award of $1,000 against three city officials who violated plaintiff's civil rights by failing to charge and arraign him within a reasonable time after arrest was held not to be inadequate. The Court noted that "[o]nce a violation of civil rights is found, a plaintiff may recover for out-of-pocket expenses and emotional distress, but there must be sufficient evidence to support such a finding."

Here, Plaintiff did move from his residence to a new residence a considerable distance away. While Morrison stated he heard rumors that he had been busted in a drug raid and did not want his children to believe he was a "dope dealer", he offered no proof as to the extent of the rumors, that they were in fact embarrassing to him, and that the rumors were the reason for his move some three months later. The causal connection between these events has simply not been shown.

We have previously pointed out that Morrison was arrested at approximately 4:30 P.M., arrived at the Public Safety Building about 6 P.M., and was released at about 10 P.M., thus being in custody approximately four hours. Morrison also testified as to the filthy conditions of the cell, and the fact

apparently ended with a consent decree with respect to a divided custody of the child.

that he felt nervous as a result of his incarceration. Under these circumstances, we find that the amount of $300 would be a fair compensation for Morrison's confinement.

 Punitive damages may be awarded in civil rights cases.

"Punitive damages are not a favorite of the law. Usually assessed both as an example and as a warning against particularly egregious conduct, such damages serve both punitive and deterrent functions. Such awards may be particularly appropriate as a means of vindicating the public interest in preventing violations of civil rights by state officials. . . . But despite its utility as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief."

*Cochetti v. Diamond*, 572 F.2d 102, 105 (3rd Cir. 1978).

The Court in *Cochetti* adopted the test for punitive damages set forth by Justice Brennan in *Adickes v. Kress & Co.*, 398 U.S. 144, 233, 90 S.Ct. 1598, 1642, 26 L.Ed.2d 142 (1970) (Brennan, J., concurring in part and dissenting in part), requiring that the defendant acted with either actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so.

 In the instant case, we do not believe the facts warrant an award of punitive damages. The actions of the Detectives do not evidence actual knowledge or reckless disregard of federally protected rights, nor has something more than a bare violation been shown.

### IV. *Conclusions of Law*

1. The Court has jurisdiction in this matter under 28 U.S.C. § 1343.

2. The arrest of Plaintiff by the Detective Defendants, who were acting under color of state law, deprived him of his Fourth Amendment rights.

3. The individual Detective Defendants failed to show that the arrest was made in good faith with a reasonable belief of probable cause.

4. Plaintiff is entitled to recover damages in the amount of $300 from Detectives Fox, DeMaio, Hores, Ciganek, Regan and Hahalyak, jointly and severally, and judgment will be so entered.

5. Plaintiff is not entitled to recover punitive damages.

6. Plaintiff failed to show that the City of Pittsburgh implemented an official custom or policy which resulted in the deprivation of his constitutional rights and is not entitled to recovery from the City of Pittsburgh, and judgment will be so entered.

7. Plaintiff failed to show that Assistant Superintendent Joyce participated or acquiesced in the unlawful arrest and is not entitled to recovery from Assistant Superintendent Joyce, and judgment will be so entered.