Charlotte **SHEPARD, as Executrix of the Estate of Cliff E. Shepard, Plaintiff,**

v.

Ronald O. **BYRD, Ron C. Bieri, the Georgia State Board of Pharmacy, Eugene L. Argo, Neil Pruitt, Clara H. Axam, Oren Harden, Jr., Peter Mills, Jr., Martin T. Grizzard, Dwight Morrison and Enloe Drug Company, Defendants.**

Civ. A. No. C81–194R.

United States District Court, N.D. Georgia, Rome Division.

Feb. 10, 1984.

Alan Herman, Atlanta, Ga., for plaintiff.

Ray Lerer, Warner Currie, Chip Murphy, Atlanta, Ga., for defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

The plaintiff in this action has brought both section 1983 and pendent malicious-prosecution claims against the defendants. Presently before the Court are motions to dismiss filed by (1) Van Morrison and the Enloe Drug Company; (2) Ron Byrd and Ron Bieri; and (3) the Georgia State Board of Pharmacy and its members—Eugene Argo, Neil Pruitt, Clara Axam, Oren Harden, Peter Mills and Martin Grizzard. These motions concern both the section 1983 and pendent malicious-prosecution claims brought against the defendants. The motions were brought under Fed.R.Civ.P. 12(b)(6), but will be treated as motions for summary judgment[1] (and referred to as

---

1. Fed.R.Civ.P. 56(c) authorizes summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). "In assessing whether the movant has met this burden, ... the evidence and all factual inferences [should be viewed] in the light most favorable to the party opposing the motion." *Clemons v. Dougherty County,* 684

F.2d 1365, 1368 (11th Cir.1982). And in deciding a motion for summary judgment, "it is no part of the [trial] court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried." *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983).

The parties have been properly notified, in accordance with *Finn v. Gunter,* 722 F.2d 711 (11th Cir.1984), that their motions for dismissal

such) because matters outside the pleadings have been presented to and considered by this Court. *See id.* 12(b); *see generally Finn v. Gunter,* 722 F.2d 711 (11th Cir. 1983).

The Court grants the Enloe Drug Company's motion for summary judgment on the section 1983 claim because the alleged constitutional deprivations the plaintiff suffered were not inflicted pursuant to a policy or custom adopted by Enloe. The motion for summary judgment on the section 1983 claim filed by the State Board of Pharmacy and its members is granted because they are immune from suit. The pendent claims brought against the Enloe Drug Company, the Board and its members are also dismissed. The summary judgment motion filed by Byrd and Bieri concerning the section 1983 claim is granted, but it is denied as it applies to the pendent malicious-prosecution claim. The motion for summary judgment filed by Morrison is denied as to both claims because of his substantial involvement in the arrest of Cliff Shepard. The facts, construed most favorably in the plaintiff's favor, are as follows.

## I. FACTS

Cliff Shepard, the plaintiff,[2] was a licensed pharmacist in the State of Georgia. He owned and operated the Garden Lakes Pharmacy in Rome, Georgia from 1972 until 1978. His health forced him to sell the Garden Lakes Pharmacy in November 1978 to Bud Landers. His health also had led him to hire several pharmacists to aid him in operating the pharmacy before he sold it in November 1978. *See* Deposition of Shepard at 20.

In January 1979 an accountability audit of some of the Schedule II (controlled substance) drugs at the Garden Lakes Pharmacy was performed by Ron Byrd, an agent of the Georgia Drug and Narcotics Agency ("GDNA").[3] These audits are routinely performed when a change-of-ownership occurs at a pharmacy. The audit revealed substantial shortages of Schedule II drugs.[4] Shepard was not notified about these shortages. *See id.* at 48.

On March 19, 1979 Shepard was employed by the Enloe Drug Company ("Enloe") at one of its stores in Rome, Georgia, which will be referred to as "Store No. 7." Van Enloe III owned Store No. 7 and Dwight Morrison was the chief pharmacist there. Shepard and Morrison were the only full-time pharmacists at Store No. 7, although two pharmacists were employed on a part-time basis. *See id.* at 25. Morrison and Shepard worked on an alternating-shift basis. *See* Tr. at 5.[5] Morrison performed all inventories of drugs at Store No. 7 and ordered all Schedule II drugs for the store. *See* Affidavit of Morrison at 1–2; Deposition of Shepard at 43. Only Morrison, Shepard and Enloe had keys to the safe in which controlled substances were kept. Morrison felt some personal animosity towards Shepard and felt threatened in his position as chief pharmacist. *See id.* at 43, 49–50, 53, 74.

| Drug | Shortage | Percentage Short |
|---|---|---|
| Percodan tablets | 24,039 | 82% |
| Dexedrin 5 mg. tablets | 3,275 | 99% |
| Dexanyl # 1 Spansules | 254 | 28% |
| Dexanyl # 2 Spansules | 1,805 | 77% |
| Eskatrol Spansules | 2,482 | 84% |

will be treated as motions for summary judgment. *See Shepard v. Byrd,* op. at 2 (N.D.Ga. Jan. 18, 1984).

2. Actually, Charlotte Shepard, as executrix of the estate of Cliff Shepard, is the plaintiff in this action. Because Cliff Shepard is the person who was involved in the incidents giving rise to this case, however, he will be referred to as the plaintiff.

3. The GDNA is an agency of the State Board of Pharmacy. *See* GA. CODE ANN. § 79A–301 to –306 (Harrison 1973 & 1981).

4. The audit covered a two-year period and revealed the following shortages:

5. Tr. refers to the transcript of Shepard's criminal trial in the Superior Court of Floyd County, Georgia.

Morrison inventoried the Schedule II drugs at Store No. 7 on May 1, 1979. Sometime after this inventory, Morrison noticed a shortage of Schedule II drugs, especially percodan tablets. He notified Van Enloe III about this shortage, who contacted the GDNA. Two GDNA agents—Ron Byrd and Ron Bieri—were assigned to investigate the situation.

Byrd and Bieri set-up an undercover operation. They first persuaded Dr. Gene Davidson to provide them with four false prescriptions for percodan tablets. On June 19, 1979 they inventoried the percodan tablets at Store No. 7, and Morrison assisted them with this inventory. Morrison also showed Byrd and Bieri a prescription for 60 percodan tablets which apparently was brought forward from a past inventory period to the present one and which was logged-in during one of Shepard's shifts. On June 20, 1979 Bieri, acting as a customer named Chris Berry, presented one of the false prescriptions to Shepard. The prescription was for 12 percodan tablets, and Shepard correctly filled it. That night Byrd and Bieri inventoried the percodan tablets at Store No. 7, again with the assistance of Morrison. They noticed that the prescription Bieri had given Shepard was altered to show that 42 percodan tablets had been dispensed. Byrd and Bieri also found that 34 percodan tablets were missing.

Byrd and Bieri staked-out Store No. 7 from 9:00 p.m. until 5:00 a.m. on the night of June 21, 1979, expecting Shepard to visit Store No. 7 after closing. *See* Tr. at 56. Shepard did not visit the Store. Several days later, Byrd contacted Van Enloe III and asked him to arrange to have Shepard work at Store No. 7 on June 26, 1979. Enloe did so. Byrd also obtained an arrest warrant for Shepard based on the June 20, 1979 incident, after consulting with the assistant district attorney for Floyd County.

On the night of June 25, 1979 Morrison, Byrd and Bieri again took an inventory of the percodan tablets at Store No. 7. After taking this inventory, Byrd and Bieri apparently took Morrison's key to the safe in which the controlled substances were kept. On June 26, 1979 Bieri again presented Shepard with a false prescription for 12 percodan tablets, and Shepard correctly filled it. Shepard was arrested as he exited Store No. 7 at about 10:00 p.m. that night. When he was arrested, Shepard had a bottle of 72 percodan tablets in the pocket of the smock he was wearing.

After Shepard's arrest, Byrd and Bieri conducted another inventory of the percodan tablets at Store No. 7. Ten percodan tablets were missing and the prescription Bieri had presented to Shepard for 12 percodan tablets on June 26, 1979 was altered to show that 42 percodan tablets had been dispensed. Also, a percodan prescription for a person named Linda Shores had apparently been altered from an unintelligible number—possibly the number 18—to 40.

Shepard was indicted on five counts of obtaining percodan tablets by fraud on September 12, 1979. *See* Byrd and Bieri's Motion for Summary Judgment, Exhibit A. On July 10, 1979 the State Board of Pharmacy (the "Board") suspended Shepard's license to practice pharmacy pending an evidentiary hearing. A notice of the hearing, which set forth the charges levelled against Shepard and outlined his rights at the hearing, accompanied the notice of suspension. *See* Board's Motion for Summary Judgment, Exhibits A, B. The hearing was continued until September 11, 1980, due to Shepard's criminal trial.

Shepard's trial began on June 23, 1980 in the Superior Court of Floyd County, Georgia. He was acquitted on June 25, 1980.

On September 4, 1980 Shepard signed a consent order prepared by the Board. This order stated that "Cliff E. Shepard, R. Ph., is charged 'with (1) altering a prescription for 12 percodan tablets on June 20, 1979; (2) altering a prescription for 12 percodan tablets on June 26, 1979; (3) having in his possession "a quantity of Percodan tablets" on June 26, 1979; (4) altering a prescription from 18 to 40 percodan tablets on June 26, 1979; and (5) altering the date on a March 27, 1979 prescription for 60 percodan tablets to June 2, 1979.'" *See id.*, Ex-

hibit F at 1–2. The consent order also noted that the accountability audit at the Garden Lakes Pharmacy on January 19, 1979 revealed substantial shortages of Schedule II drugs. The order further contained the condition that "Cliff E. Shepard, R.Ph. . . . agrees to bring no legal action whatsoever against the [Board,] its agents and its representatives." *Id.* at 3. The order then reinstated Shepard's license to practice pharmacy and placed him on probation for two years. Shepard signed this order because he needed to return to work. *See* Deposition of Shepard at 35.

Shepard was contacted by the Board during September and November of 1980. He was told that the September 4, 1980 consent order was unacceptable to the Board, and on November 18, 1980 he was furnished with an acceptable consent order.[6] This order is identical to the September 4, 1980 order, except that the covenant not to sue was expanded to cover the "[Board], its agents, it[s] representatives, *or any individual connected whatsoever in the investigation of the matters mentioned in this consent order."* Plaintiff's Complaint, Exhibit A at 4. (emphasis added). Shepard refused to sign this order.

An evidentiary hearing was therefore held before one of the Board's hearing officers on December 15, 1980. The officer found Shepard guilty of 1) altering the June 20 and June 26, 1979 prescriptions for percodan tablets, 2) possessing 72 percodan tablets on June 26, 1979, and 3) causing the shortage of Schedule II drugs at the Garden Lakes Pharmacy. The hearing officer therefore held that Shepard violated GA. CODE ANN. § 79A–822(a)(3) (Harrison 1973) and Board Rule 480–11–.01(a) and recommended that Shepard's license to practice pharmacy be revoked. Shepard was afforded an opportunity to appeal this decision, but he did not. On March 25, 1981 the hearing officer's decision was adopted as the final order of the Board. *See* GA.CODE ANN. § 3A–118(a) (1981);

Board's Motion for Summary Judgment, Exhibit M.

On June 12, 1981 Shepard moved for a re-hearing of the Board's decision. The Board denied this request on July 16, 1981. *See id.,* Exhibit D. Shepard therefore filed the present action.

Shepard's complaint contains four counts. In Count I Shepard alleges that Byrd, Bieri, the Board, Morrison and Enloe are individually and jointly liable for maliciously prosecuting him in violation of 42 U.S.C. § 1983 (1981). In Count II Shepard claims that the Board and its members— Eugene Argo, Neil Pruitt, Clara Axam, Oren Harden, Pete Mills and Martin Grizzard—deprived him of "his liberty and freedom to pursue a lawful occupation in violation of the Fifth and Fourteenth Amendments to the United States Constitution" by conditioning the reinstatement of his license on the waiver of his right to sue any person involved in his investigation. Count III of Shepard's complaint alleges that all the defendants were involved in a conspiracy to maliciously prosecute him in violation of 42 U.S.C. § 1985(3) (1981).[7] Count IV of Shepard's complaint contains a pendent claim for malicious prosecution, naming Byrd, Bieri, the Board, Morrison and Enloe as defendants. Shepard seeks $1,000,000.00 in compensatory and $1,000,-000.00 in punitive damages in each of the four counts of his complaint. The defendant's have responded to the plaintiff's complaint by filing motions to dismiss, which, as noted earlier, will be treated as motions for summary judgment.

## II. THE MOTION FOR SUMMARY JUDGMENT FILED BY THE BOARD AND ITS MEMBERS

The Board and its members—Eugene Argo, Neil Pruitt, Clara Axam, Oren Harden, Peter Mills and Martin Grizzard— first contend in their motion for summary

---

6. The parties have raised no issue regarding the Board's obligation to honor the September 4, 1980 consent order.

7. This count has been voluntarily dismissed by the plaintiff. *See* note 26 *infra.*

judgment that the eleventh amendment[8] bars the plaintiff's action against them. Regarding the Board, the eleventh amendment bars suits brought in federal court "directly against a State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity" or has consented to the suit. *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304 at 3314, 73 L.Ed.2d 1057 (1982); *see Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Cate v. Oldham,* 707 F.2d 1176, 1180 (11th Cir. 1983).[9] Whether an agency—such as the Board—is an agency of the State that is protected by the eleventh amendment, or whether it is a municipal corporation or other subdivision of the state which is not protected by this amendment, " 'turns on [the] function and character [of the agency] as determined by state law.' " *Fouche v. Jekyll Island-State Park Authority,* 713 F.2d 1518 at 1520 (11th Cir.1983) (quoting *Sessions v. Rusk State Hospital,* 648 F.2d 1066, 1069 (5th Cir.1981)). Considerations relevant to this determination include "the definition of 'state' and 'political subdivision' [under state law,] the state's degree of control over the entity and the fiscal autonomy of the entity." *Fouche, supra; see Mt. Healthy City District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

■ Georgia law does not define the terms "state" or "political subdivision." Section 40–3505(c) of the Executive Reorganization Act of 1972 provides, however, that an agency which is assigned administrative authority by the state "shall retain its separate identity as an instrumentality of the State and [as] a public corporation." GA.CODE ANN. § 40–3505(c) (Harrison 1975). The Board is such an agency. *See id.* § 40–3523. Thus, section 40–3505(c) suggests that the Board should be considered a state entity under the first portion of the *Fouche* test.

The State of Georgia also exercises a great deal of political and fiscal control over the Board. All six members of the Board are appointed by the Governor of Georgia. *See id.* § 79A–202, –202.1 (1975 & 1981). All fees collected from the licensing of pharmacists are remitted to the Fiscal Division of the Department of Administrative Services of the State of Georgia. *See id.* § 84–101. The compensation of the Board members is paid by this administrative body, and any surplus fees are kept by this body "for the use and maintenance of the several examining boards...." *id.; see id.* 79A–206. Because of the control the State exercises over the Board, and because the Board appears to be an entity of the state as defined by Georgia law, this Court is compelled to conclude that the Board is immune from the plaintiff's action by virtue of its eleventh amendment immunity.

■ In addition to applying to a state agency the eleventh amendment confers immunity in some situations to agency officials who act in their official capacity. The scope of this immunity is summarized in *Treasure Salvors, supra,* 102 S.Ct. at 3334, 3337:

The Eleventh Amendment does not bar an action against a state official that is based on a theory that the officer acted beyond the scope of his statutory author-

---

8. The eleventh amendment provides:
 The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 Although the eleventh amendment by its terms does not bar suits against a state by its own citizens, the Supreme Court has held that eleventh amendment immunity extends to this type of suit. *See, e.g., Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 280,

93 S.Ct. 1614, 1615, 36 L.Ed.2d 251 (1973); *Hans v. Louisiana,* 134 U.S. 1, 15, 21, 10 S.Ct. 504, 507, 509, 33 L.Ed. 842 (1890).

9. *But cf. Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1975) ("Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts").

ity or, if within that authority, that such authority is unconstitutional. In such an action, however, the Amendment places a limit on the relief that may be obtained by the plaintiff. If the action is allowed to proceed against the officer only because he acted without proper authority, the judgment may not compel the State to use its funds to compensate the plaintiff for the injury. In *Edelman v. Jordan* the Court made clear that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."

(footnotes and citations omitted). *See also Cate, supra,* at 1180–82. In this case the plaintiff's action is for monetary damages only and therefore must be dismissed as it applies to the Board members in their official capacities. *Accord Hicks v. Georgia State Board of Pharmacy,* 553 F.Supp. 314, 317 (N.D.Ga.1982).

■ The Board members also claim, based on *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1977), that they are immune from suit in their individual capacities. In *Butz* the Supreme Court held that "federal executive officials exercising discretion are entitled only to ... qualified immunity ... [in a suit for damages arising from unconstitutional action], subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of public business." *Id.* at 507, 98 S.Ct. at 2911.[10] The Court then identified three types of officials whose functions required absolute immunity from suit: judges, prosecutors and executive officials who make the discretionary decision to initiate administrative proceedings against a party. *See id.*

at 508–517, 98 S.Ct. at 2911–2916. Of course, *Butz* immunity applies only when an official acts within the scope of his judicial, prosecutorial or executive capacity. *See id.* at 495, 98 S.Ct. at 2905; *cf. Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976) ("prosecutors enjoy immunity when they are performing quasi-judicial functions that are an integral part of the judicial process"). And *Butz* applies to federal, as well as state, officials. *See Butz, supra,* 438 U.S. at 503–04, 98 S.Ct. at 2909–10; *cf. Marrero v. City of Hialeah,* 625 F.2d 499, 507 (5th Cir.1980) (federal and state prosecutors entitled to same degree of immunity).

■ It is apparent that the Board members are executive officials who make discretionary decisions to initiate administrative proceedings. *See* GA. CODE ANN. § 79A–208 (Harrison 1973) (the Board has the power to investigate alleged violations of pharmacy and drug laws, to "suspend, revoke or cancel [a pharmacist's] license in accordance with law" and to "perform such other duties ... as may be necessary and proper to accomplish the foregoing ..."). In light of this status, the issue under *Butz* becomes whether the Board members acted beyond the scope of their duties as executive officials by conditioning the reinstatement of Shepard's license on his "voluntary [agreement] to bring no legal action whatsoever against the [Board], its agents, it[s] representatives, *or any individual connected whatsoever in the investigation of the matters mentioned in [the] Consent order*" (emphasis added).[11]

No case is directly on point on this issue.[12] Two cases—*MacDonald v. Musick,*

10. *Butz* immunity applies only in actions involving alleged violations of constitutional rights. *See Evans v. Wright,* 582 F.2d 20, 21 (5th Cir. 1978).

11. Federal law controls this determination. *See Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir. 1981).

12. Most cases which are tangentially relevant to this issue discuss situations in which (1) prosecutors act beyond the scope of quasi-judicial

activities, *see Stepanian v. Addis,* 699 F.2d 1046, 1048 (11th Cir.1983) (federal prosecutor's statements to news media do not fall within the range of quasi-judicial immunity); *Marrero v. City of Hialeah,* 625 F.2d 499, 505–510 (5th Cir. 1980) (same); (2) judges act beyond the bounds of their office, *see Scott v. Hayes,* 719 F.2d 1562 at 1564 (11th Cir.1983) (judge absolutely immune from comments from bench suggesting that husband in a divorce proceeding have a vasectomy as a condition of a favorable property settlement); *Beard v. Udall,* 648 F.2d 1264,

425 F.2d 373 (9th Cir.), *cert. denied* 400 U.S. 852, 91 S.Ct. 54, 27 L.Ed.2d 90 (1970), and *Boyd v. Adams*, 513 F.2d 83 (7th Cir. 1975)—are, however, instructive. In *MacDonald* the plaintiff was arrested for driving while under the influence of intoxicating liquor. The prosecutor, who filed a complaint charging him with this offense, proposed to drop the charge if the plaintiff would stipulate that there was probable cause for his arrest. The plaintiff refused, and as a result of this refusal the prosecutor moved to amend the complaint to include an additional charge of resisting arrest. This motion was granted. The plaintiff was tried and acquitted on the first charge, but convicted on the second charge. He therefore filed a habeas corpus action, arguing that the prosecutor's conduct led to an unconstitutional conviction.

In deciding this contention, the Court noted that the prosecutor had offered the following explanation for his conduct:

Normally a defendant will stipulate to probable cause, and there is only one reason, let's face it, for that stipulation, so that the defendant cannot sue the police department. This particular defendant would not stipulate to probable cause, which made it obvious, at least, there was an inference drawn, that perhaps here is a defendant that does have in mind suing the police department.
. . . . . . . . . . . . . .
It seems to me that it is the duty of the Deputy District Attorney, in addition to prosecuting criminals, to protect the police officers, and in so protecting the police officers, it seems to me, after evaluating the facts, any Deputy District Attorney worth his salt would have at that

point included any offense, obviously, in the report on which the defendant could have been convicted.

*Id.* at 375. The court disagreed with the prosecutor's conclusion. It analogized the prosecutor's conduct to extortion and stated that

It is no part of the proper duty of a prosecutor to use a criminal prosecution to forestall a civil proceeding by the defendant against policemen, even where the civil case arises from the events that are also the basis for the criminal charge. We do not mean that the prosecutor cannot present such a criminal charge. What he cannot do is condition a voluntary dismissal of a charge upon a stipulation by the defendant that is designed to forestall the latter's civil case.

*Id.* The *MacDonald* court therefore held that the prosecutor's actions went beyond the bounds of quasi-judicial conduct and released the plaintiff from custody.

In *Boyd v. Adams*, 513 F.2d 83 (7th Cir.1975), the plaintiff was forcibly arrested by two policemen. She was charged with disorderly conduct and resisting a police officer in the performance of his duty. The prosecutor agreed to dismiss these charges if the plaintiff would release the police officers from liability. The plaintiff executed the release. She later brought a section 1983 action, contending that the release was void as against public policy. She sought both monetary and equitable[13] relief.

The Boyd court first held that the prosecutor was immune from the section 1983 monetary damages claim, as he was acting

1268–70 (9th Cir.1981) (judge does not enjoy absolute immunity if he conspires to incarcerate the plaintiff); *Harper v. Merckle*, 638 F.2d 848, 856–59 (5th Cir.1981) (Unit B) (judge is not entitled to absolute immunity in holding the plaintiff in contempt of court for a matter not pending before the court); *Rankin v. Howard*, 633 F.2d 844, 847–48 (9th Cir.1980) (judge's private agreement to decide a case in favor of one party is not a judicial act entitling him to absolute immunity); *Lopez v. Vanderwater*, 620 F.2d 1229, 1234–37 (7th Cir.1980) (judge acting as a prosecutor in inducing a plea of guilty is not absolutely immune from suit); *compare Slavin*

*v. Curry*, 574 F.2d 1256, 1263–64 (5th Cir.1978) (judge enjoyed absolute immunity against charges concerning the cancellation of a bond and the alteration of a transcript); and (3) the voluntariness of a release is questioned. *See, e.g., Jones v. Tabor*, 648 F.2d 1201, 1203–06 (9th Cir.1981) (county prisoner's release of the county and all individuals involved in his beating held to present a question of fact as to its voluntariness).

**13.** She sought to enjoin the practice of exchanging dismissals for releases.

within the scope of his quasi-judicial function. *See id.* at 86. The court then held that the release signed by the plaintiff was void as against public policy. It reasoned that

> [t]he major evil of these agreements [i.e. releases] is not that charges are sometimes dropped against people who probably should be prosecuted. Much more important, these agreements suppress complaints against police misconduct which should be thoroughly aired in a free society. And they tempt the prosecutor to trump up charges for use in bargaining for suppression of the complaint.

*Id.* at 89 (quoting *Dixon v. District of Columbia,* 394 F.2d 966, 969 (D.C.Cir. 1968)).

The *MacDonald* and *Boyd* courts thus reach contrary results regarding whether the practice of obtaining a release from civil liability for a dismissal constitutes a quasi-judicial function of a prosecutor. *MacDonald* is, however, more persuasive than *Boyd* because of the apparently contradictory holdings in *Boyd.*[14] Both courts agree, however, that the practice of obtaining release from civil liability in exchange for the dismissal of charges is akin to extortion. *See also Horne v. Pane,* 514 F.Supp. 551, 552 (S.D.N.Y.1981).

To determine whether the Board members acted beyond the scope of their statutory authority, a review of the authority conferred on them is necessary. Under GA.CODE ANN. § 79A–208(k) (Harrison 1973) the Board is empowered to "suspend, revoke or cancel any [pharmacist's] license in accordance with law." The Board is also empowered to "investigate alleged violations of the [laws and regulations] pertaining to the sale or dispensing of drugs, [and] to conduct hearings in respect thereto when in its discretion it appears to be necessary, ..." *Id.* § 79A–208(f). The administrative rules governing hearings also provide that, "unless precluded by law, infor-

mal disposition may be made of any contested case by stipulation, agreed settlement, consent order, or default." *Id.* § 3A–114(4).

■ Although section 3A–114(4) gives the Board broad authority to settle a case, it specifies that the means the Board employs must be lawful. By conditioning the reinstatement of Shepard's license to practice pharmacy on the release from civil liability of *any* person connected with his investigation and arrest, this Court holds that the Board engaged in a practice which is against public policy and is thus unlawful. The Court considers this practice as against public policy because (1) it forestalls civil actions designed both to compensate citizens for lawless governmental conduct and to deter such conduct, *see Boyd, supra,* at 88–89; *MacDonald, supra,* at 375, and (2) it induces the Board to base its decision to reinstate a license not only on the merits of a pharmacist's conduct, but also on the manner in which the investigation of a pharmacist was conducted. The Board members therefore are not absolutely immune from suit in their individual capacities.

■ Although the Board members do not enjoy absolute immunity from suit in their individual capacities, they will be afforded qualified immunity if their conduct "did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727 at 2738, 73 L.Ed.2d 396 (1982). It is apparent that the Board did not clearly violate section 3A–114(4) by conditioning the reinstatement of Shepard's license on the release because that section does not expressly prohibit such a practice. Moreover, as *Boyd* and *MacDonald* illustrate, the validity of a release such as the one involved in this case has not been definitively decided. The Court therefore holds

---

**14.** The *Boyd* court held that (1) a prosecutor is absolutely immune from a damage suit resulting from his attempt to exchange a dismissal for a release, and (2) such a release is void as against public policy. One inference to be drawn from these holdings is that a prosecutor enjoys absolute immunity when he undertakes an action which is against public policy.

the members of Board immune from damages in the present action based on their qualified immunity. *Cf. Zeigler v. Jackson,* 716 F.2d 847 at 849–850 (11th Cir.1983) (members of a commission enjoyed qualified immunity for an action which complied with Alabama statutory law); *Dilmore v. Stubbs,* 636 F.2d 966 (5th Cir.1981) (Unit A) (hospital officials afforded qualified immunity because of the difficult issue of whether an admissions policy was constitutional).[15]

## III. BYRD AND BIERI'S MOTION FOR SUMMARY JUDGMENT

In addition to the motion for summary judgment filed by the Board and its members, GDNA agents Byrd and Bieri have filed a motion for summary judgment. Byrd and Bieri first argue that the plaintiff has not alleged a claim which is cognizable under section 1983.

 Ordinarily, a claim of malicious prosecution does "not constitute a deprivation of life, liberty or property without due process of law and, therefore, is not cognizable under 42 U.S.C. § 1983." *Cline v. Brusett,* 661 F.2d 108, 112 (9th Cir.1981). An exception to this rule exists, however, "for malicious prosecutions conducted with the intent of denying a person equal protection or which otherwise subject a person to a denial of constitutional rights." *id; see Beker Phosphate Corp. v. Muirhead,* 581 F.2d 1187, 1189–90 (5th Cir.1978). In this case the prosecution of Shepard caused him to lose his license to practice pharmacy. Thus, Shepard's prosecution deprived him of the right "to engage in [one] of the common occupations of life." *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1922); *see Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Shepard's claim of malicious prosecution therefore is cognizable under section 1983.

 Byrd and Bieri next argue that both Shepard's section 1983 and malicious prosecution action cannot be maintained because the proceedings before the Board did not terminate in his favor. It is true that, in order to maintain a malicious prosecution action under section 1983 or Georgia law, the prosecution giving rise to a suit must terminate in the plaintiff's favor. *See, e.g., Singleton v. City of New York,* 632 F.2d 185, 193–95 (2d Cir.1980), *cert. denied* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Cooper v. Public Finance Corp.,* 146 Ga.App. 250, 254, 246 S.E.2d 684 (1978). Shepard bases this suit on his prosecution in the Superior Court of Floyd County, however, and not on the proceedings conducted by the Board. Because Shepard was acquitted in the Floyd County suit, the requirement of a favorable termination of a previous action is met in this case.

 The third issue raised by Byrd and Bieri in their motion for summary judgment is whether they enjoy immunity in their official capacities from Shepard's section 1983 and pendent-state claims by virtue of the eleventh amendment. As noted earlier, the eleventh amendment does not bar all suits against state officers who act beyond the scope of their statutory authority, only those suits that "compel the State to use its funds to compensate the plaintiff for the injury." *Treasure Salvors, supra,* 102 S.Ct. at 3317. The present suit seeks only monetary damages as relief, and it is clear that Byrd and Bieri are "state officers." *See* GA.CODE ANN. § 79A–301 (Harrison 1978). Furthermore, eleventh amendment immunity not only applies to federal claims brought in federal court, but also applies to state-law claims brought into federal court under pendent jurisdiction. *See Pennhurst State School & Hospital v. Halderman,* — U.S. —,

---

**15.** Because the federal cause of action against the Board and its members is dismissed, the Court finds it appropriate to dismiss the pendent state claim against these parties. *See Prince v. Wallace,* 568 F.2d 1176, 1178 (5th Cir. 1978); *Bartee v. Yanoff,* 514 F.Supp. 96, 98–99

(E.D.Pa.1981), *aff'd* 672 F.2d 309 (3d Cir.1982), *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1983); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

104 S.Ct. 900, 909–920, 79 L.Ed.2d 67 (1984). Neither the section 1983 or the pendent claim of malicious prosecution may therefore proceed against Byrd and Bieri in their official capacities.

 Next, Byrd and Bieri argue that the section 1983 action brought against them in their individual capacities is barred by virtue of their qualified immunity.[16] The standard for evaluating a qualified immunity defense was recently set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). There the Supreme Court held that governmental officials exercising discretionary functions are "shielded from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738; *see also Scott v. Dixon*, 720 F.2d 1542 at 1547 (11th Cir.1983). In the context of an officer or agent who conducts an arrest, this standard precludes civil liability if the officer or agent acted with a reasonable belief in the legality of the arrest and conducted the arrest in a reasonable manner. *See, e.g., Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir.1972); *Morrison v. Fox*, 483 F.Supp. 390, 391, 395 n. 1 (W.D. Pa.1979). Furthermore, both the proper issuance of an arrest warrant by a magistrate (and the execution of this warrant in a reasonable manner) and the return of an indictment by a properly constituted grand jury conclusively establish the reasonableness of the legality of an arrest. *See Garris v. Rowland*, 678 F.2d 1264, 1272–73 (5th Cir.1982), *cert. denied* 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d 121 (1983); *Smith v. Gonzales*, 670 F.2d 522, 526–27 (5th Cir. 1982), *cert. denied* 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1983); *Rodriguez v. Ritchey*, 556 F.2d 1185, 1190–91 (5th Cir.

1977) (en banc), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978).[17]

 In this case a properly constituted grand jury indicted Shepard for offenses resulting from the acts which led to his arrest. Also, the plaintiff does not contend that any defendant acted improperly in procuring this indictment. *See id* at 1194–95. Thus, it is apparent that Byrd and Bieri are immune from the plaintiff's section 1983 claim in their individual capacities.

Byrd and Bieri also argue that they are entitled to summary judgment on the state-law malicious-prosecution claim. This argument will be evaluated in Section V of this order along with a similar motion raised by Morrison. As will be seen, this portion of the motion for summary judgment will be denied.

## IV. PENDENT JURISDICTION

Given the fact that Byrd and Bieri are immune from the plaintiff's section 1983 action in both their official and individual capacities, the issue arises whether the Court should exercise pendent jurisdiction over the state-law malicious-prosecution claim brought against them (Count IV). To exercise pendent jurisdiction over this claim, the two-prong test of *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), must be satisfied. This test was recently set forth in *Phillips v. Smalley Maintenance Services, Inc.*, 711 F.2d 1524 (11th Cir.1983):

The two prongs of the *Gibbs* test are (1) the existence of power to hear the state claims and (2) the proper use of the discretion to exercise that power in [a] case. In determining power to hear the claims "[t]he federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive

---

16. Police officers or investigating agents do not enjoy absolute immunity from civil liability for section 1983 violations. *See Scott v. Dixon*, 720 F.2d 1542 at 1547 (11th Cir.1983).

17. Decisions handed down by the Court of Appeals for the Fifth Circuit before September 30, 1981 are binding authority, whereas decisions rendered after this date are of persuasive value only. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

from a common neucleus of operative fact.... [I]f ... a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues there is power in federal courts to hear the whole." As to the proper exercise of discretion, the court must keep in mind that "[the doctrine's] justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims...."

*Id.* at 1531 n. 4 (citations omitted).

This Court clearly has the power to decide the state-law malicious-prosecution claim brought against Byrd and Bieri. *See Rheaume v. Texas Dept. of Public Safety,* 666 F.2d 925, 931–32 (5th Cir.1982). Thus, the question becomes whether this Court should, in its discretion, entertain the state-law claim.

In deciding whether to exercise pendent jurisdiction in such a context, courts have mainly focused on two considerations: (1) whether the state-law claim would be barred in state court, if dismissed from the federal action, *see Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp.,* 711 F.2d 989, 999–1000 (11th Cir.1983); *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), and (2) whether the dismissal of the state-law claim would result in the inefficient use of judicial resources. *See Kleiner v. First National Bank of Atlanta,* 97 F.R.D. 683, 689 (N.D.Ga.1983).

 In this case the first consideration—the viability of the malicious prosecution claim in the state courts—weighs in favor of dismissing this claim because the plaintiff timely filed a suit in the Superior Court of Floyd County, Georgia which preserves this claim. The second consideration—the efficient use of judicial resources—strongly weighs in favor of retaining jurisdiction over the state law claim. The plaintiff has alleged that Morrison conspired with Byrd and Bieri to maliciously prosecute Shepard in violation of section 1983. Thus, to prove his 1983 claim against Morrison, the plaintiff must essentially prove the allegations of malicious prosecution he has levelled against Byrd and Bieri. As will be seen later, the section 1983 malicious-prosecution claim brought against Morrison will survive his motion for summary judgment. Thus, to dismiss the state-law claim against Byrd and Bieri would be tantamount to authorizing a retrial of this case. *See Phillips, supra,* at 1531. Furthermore, although not a determinative consideration, this case has been pending in this Court for over two years and has occupied a considerable portion of the Court's time. *See Kleiner, supra.* Finally, the state-law claim against Byrd and Bieri does not present novel questions of state law which this Court should refrain from deciding. *See Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139; *Kleiner, supra; Briggs v. American Air Filter, Inc.,* 455 F.Supp. 179, 182 (N.D.Ga.1978), *aff'd* 630 F.2d 414 (5th Cir.1980). Accordingly, the Court will maintain jurisdiction over the state-law malicious-prosecution claim brought against Byrd and Bieri.[18]

## V. MORRISON AND ENLOE'S MOTION FOR SUMMARY JUDGMENT

[21–23] Enloe, in the motion for summary judgment it filed with Morrison, con-

18. The Court notes that it has decided to retain pendent jurisdiction over the state-law claim brought against Byrd, Bieri and Morrison while dismissing the pendent claim brought against the Board and Enloe. *See* note 15 *supra* and note 20 *infra.* The Court refuses to maintain jurisdiction over the state-law claim brought against the Board because this claim involves many facts which are both unrelated to the claims brought against Morrison, Byrd and Bieri and are possibly prejudicial to their defense.

The Court has decided not to exercise pendent jurisdiction over the state-law claim brought against Enloe because Morrison and Enloe possess a sufficient identity of interest to estop any subsequent state-court action the plaintiff may press against Enloe, thereby eliminating the possibility of a duplicative trial. *See generally* O.C. G.A. § 9–10–13 (Michie 1981) (formerly GA. CODE ANN. § 38–624 (Harrison 1981)); 1B MOORE'S FEDERAL PRACTICE ¶ 0.405[9], 0.411 (2d ed. 1983).

tends that it cannot be held liable on Shepard's section 1983 claim because it did not injure Shepard in any manner. Under section 1983 it is clear that Enloe, as a corporation, cannot be held liable based on the employer-employee relationship between it and Morrison, for section 1983 will not support a claim based on a *respondeat superior* theory of liability. *See Hamm v. Members of Board of Regents,* 708 F.2d 647, 650 (11th Cir.1983). *Iskander v. Village of Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982); *Howell v. Tanner,* 650 F.2d 610, 615 n. 8 (5th Cir.1981) (Unit B). In order to state a claim against Enloe, then, Shepard must show that Morrison acted pursuant to an " 'impermissible policy' or a 'constitutionally forbidden' rule or procedure" adopted by Enloe. *Iskander, supra; see Walters v. City of Ocean Springs,* 626 F.2d 1317, 1323 n. 3 (5th Cir.1980) (Unit A).[19] The plaintiff has presented no evidence regarding any of Enloe's policies or procedures, and the only Enloe policy Morrison could have been acting in accordance with, based on the evidence before the Court, was one which mandated the investigation of drug shortages. *See* Affidavit of Van Enloe III at 2. This policy is an entirely legitimate policy, and does not subject Enloe to liability in this case. *See Iskander, supra,* at 128–29. Accordingly, the section 1983 action against Enloe is dismissed.[20]

Morrison first argues, in the motion for summary judgment he filed with Enloe, that he is entitled to the grant of summary judgment on Shepard's section 1983 malicious prosecution claim and his pendent claim for malicious prosecution because he merely relayed facts to an official of the GDNA, who then made the independent decision to prosecute. Before evaluating this contention, the law applicable to a sec-

tion 1983 malicious prosecution claim must be determined.

To define the elements of the section 1983 claim of malicious prosecution, reference should be made to "traditional doctrines of tort liability" unless "such borrowing would be in conflict with the goals" of section 1983. *Edwards v. Sotomayor,* 557 F.Supp. 209, 217 (D.P.R.1983); *see Board of Regents v. Tomanio,* 446 U.S. 478, 485–86, 100 S.Ct. 1790, 1795–96, 64 L.Ed.2d 440 (1980); *Norton v. Liddel,* 620 F.2d 1375, 1382 (10th Cir.1980). The goals of section 1983 include "compensation of persons injured by a deprivation of federal rights and the prevention of abuses of power by those acting under color of state law." *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980) (citing *Robertson v. Wegmann,* 436 U.S. 584, 591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978)). The definition of malicious prosecution under Georgia law is consonant with both traditional tort-law doctrines and section 1983. *Compare Cooper v. Public Finance Corp.,* 146 Ga.App. 250, 254, 246 S.E.2d 684 (1978) *and* GA.CODE ANN. § 105–801 (Harrison 1968) *with* W. PROSSER, LAW OF TORTS 853–56. Georgia law therefore will be used to evaluate Morrison's contention as it applies both to the section 1983 action and the pendent claim.

GA.CODE ANN. § 105–801 (Harrison 1968), defines a malicious prosecution as a "criminal prosecution, maliciously carried on, and without any probable cause, [which] damages ... the person prosecuted...." Thus, a plaintiff must prove the following elements to maintain a cause of action for malicious prosecution under Georgia law: (1) a criminal prosecution which was instituted maliciously and which terminated in favor of the plaintiff, (2) that the criminal prosecution was instituted without probable cause, and (5) that

---

**19.** A private corporation may also be held liable when it "undertakes to perform duties which have been largely within the province of the State, and wherein it receives substantial sums of money from the State for the performance of such duties...." *Kentucky Assoc. for Retarded Citizens v. Conn,* 510 F.Supp. 1233, 1250 (W.D.

Ky.1980) (citing *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

**20.** The Court also finds it appropriate to dismiss the pendent claim against Enloe. *See* note 15 and 18 *supra.*

the plaintiff was damaged by the prosecution. *See Cooper, supra.* No cause of action exists, however, against a person who merely relays facts to an official who then makes an independent decision to arrest or prosecute. As stated in *Ginn v. Citizens and Southern National Bank,* 145 Ga.App. 175, 178, 243 S.E.2d 528 (1978):

> The law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for ... malicious prosecution; in the latter case there is not.

*See also Dixie Beer Co. v. Boyett,* 158 Ga.App. 622, 623, 281 S.E.2d 356 (1981).

■ In this case it is apparent that Morrison did more than merely relay facts to the GDNA agents. He took an active role in the investigation of Shepard. He inventoried drugs with Byrd and Bieri and was present at Shepard's arrest. Although these actions may have all been taken in response to instructions from Byrd and Bieri, they raise an inference that Morrison did more than simply make "statements ... in good faith to police officers or others investigating criminal activity...." *Moses v. Revco Discount Drug Centers of Georgia, Inc.,* 164 Ga.App. 73, 75, 296 S.E.2d 384 (1982); *see Melton v. LaCalamito,* 158 Ga.App. 820, 822–23, 282 S.E.2d 393 (1981). Thus, although a jury may find that Morrison merely aided Byrd and Bieri in accordance with their requests, the Court is unable to do so at this time.

■ Morrison next contends that Shepard's section 1983 and pendent state-law claim for malicious prosecution must fail because no evidence exists which shows that he acted with malice. Malice "may consist [of] personal spite or ... a general disregard of the right consideration of mankind, directed by chance against the individual." *Melton, supra,* at 824, 282 S.E.2d 393. The following evidence of malice on Morrison's behalf exists: (1) Morri-

son was the sole person responsible for the taking of inventories of Schedule II drugs at Store No. 7, and he refused Shepard's offer of assistance when taking the inventory in May 1979; (2) Shepard believed Morrison felt threatened by his presence at Store No. 7 because Morrison was the senior pharmacist there and Shepard had increased business at Store No. 7; and (3) Morrison acted in a hostile manner towards Shepard. *See* Deposition of Shepard at 43, 49–50, 53, 74. These facts raise at least a disputed factual question regarding whether Morrison acted maliciously towards Shepard. *See generally Diamond v. Marland,* 395 F.Supp. 432, 442 (S.D.Ga.1975) (summary judgment is "apt to be inappropriate when 'subjective feelings and reactions' are material") (footnote omitted).

■ Morrison's third contention in his motion for summary judgment is that there was probable cause to believe that Shepard was responsible for the shortage of Schedule II drugs at Store No. 7, thereby insulating him from Shepard's claims. A thorough definition of probable cause—in the context of a malicious prosecution claim—was set forth in *Melton:*

> Probable cause is defined to be the existence of such facts and circumstances as would excite the belief in a reasonable mind, that the person charged was guilty of the crime for which he was prosecuted. While [probable cause] need not approach absolute certainty as to the facts, and it is not inconsistent with a considerable element of doubt, it must be more than mere conjecture or unfounded suspicion. Beyond this, the belief must be supported by appearances known to the defendant at the time, and a prosecution instituted without probable cause cannot be justified by anything, short of guilt in fact, which comes to the knowledge of the defendant later.... The appearances must be such as to lead a reasonable man to set the criminal proceeding in motion. The defendant is not necessarily required to verify his information, where it appears to be reliable; but *where a reasonable man would in-*

*vestigate further before beginning the prosecution,* he may be liable for failure to do so. All such factors as the reliability of the source, the availability of further information and the difficulty of obtaining it, the reputation of the accused, and his opportunity to offer an explanation, and the apparent necessity of prompt action, are to be considered in determining whether it was reasonable to act without verification.

*Id.* 158 Ga.App. at 823–24, 282 S.E.2d 393 (emphasis added).[21] Furthermore, the "grand jury's return of [an] indictment against [a potential plaintiff]," the issuance of a warrant for the arrest of a plaintiff or the consultation of counsel before the securing of an arrest warrant for a plaintiff are all "prima facie but not conclusive evidence that the probable cause existed for the prosecution" of the plaintiff. *Hill v. Trend Carpet,* 154 Ga.App. 446, 446, 268 S.E.2d 682 (1980); *see Peppas v. Miles,* 82 Ga.App. 438, 439, 61 S.E.2d 429 (1950); *Auld v. Colonial Stores,* 76 Ga.App. 329, 45 S.E.2d 827 (1947).

██ The record in this case indicates that *Morrison* discovered shortages of Schedule II drugs sometime in June 1979. As stated by Morrison in his affidavit:

In June of 1979, and as part of my duties as the Pharmacist-In-Charge at Enloe Drug Store No. 7, I discovered substantial shortages in Class II drugs, particularly Percodan and Percodan-Demi. I further discovered that various prescriptions had been taken out of proper sequence according to the number printed on the prescription form and moved forward in the prescription book. Other prescriptions appeared to me to have been altered and my records revealed that recently more orders for Percodan tablets had been made than had been made in the past, and more than were actually being prescribed, with no apparent reason for the increase.

Affidavit of Morrison at 2. *See also* Tr. at 19–21, 27–28. Morrison then reported these findings to Van Enloe III. There is no indication that Morrison took any steps to determine whether any of the part-time pharmacists might be responsible for the shortages, or whether the shortages resulted from accident or mistake. Furthermore, Shepard was never questioned about the shortages by Morrison. The Court therefore holds that a disputed factual question exists regarding whether Morrison conducted an adequate investigation before reporting the shortages to Van Enloe III and aiding the GDNA in investigating Shepard. *See Melton, supra,* 158 Ga.App. at 823–24, 282 S.E.2d 393.

Byrd and Bieri also contend, in their motion for summary judgment, that they are entitled to judgment in their favor on the malicious-prosecution claim brought against them. They first argue that they had probable cause to arrest Shepard and are thus insulated from the plaintiff's claim. The evidence relevant to this contention shows that the GDNA was informed by Van Enloe III and Morrison about the shortage of Schedule II drugs at Store No. 7, and GDNA agents Byrd and Bieri were dispatched to investigate this occurrence. Morrison was the only person authorized to inventory drugs at Store No. 7, and only Morrison, Enloe and Shepard had keys to the safe in which controlled substances were kept. Byrd, Bieri and Morrison inventoried the Schedule II drugs at Store No. 7 on June 19, 1979. At this time Morrison also showed Byrd and Bieri a prescription for 60 percodan tablets which apparently was brought forward from a past inventory to the present one and which was logged-in during one of Shepard's shifts.

On June 20, 1979 Bieri presented a false prescription for 12 percodan tablets to Shepard, which he filled correctly. That evening Morrison, Byrd and Bieri entered

---

**21.** *See also* GA. CODE ANN. § 105–802 (Harrison 1968), which provides:

Want of probable cause shall be a question for the jury, under the direction of the court, and shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused.

Store No. 7. An inventory of the Schedule II drugs was taken, and a shortage of 34 percodan tablets was discovered. Byrd, Bieri and Morrison also noted that the false prescription filled by Shepard on that day had been altered from 12 to 42 tablets. The next evening Byrd and Bieri conducted a surveillance of Store No. 7 from 9:00 p.m. until 5:00 a.m., but no one appeared at the store.

On the night of June 25, 1979 Byrd, Bieri and Morrison again inventoried the percodan tablets at Store No. 7. After taking this inventory, Byrd and Bieri apparently took Morrison's key to the safe in which the controlled substances were kept. A warrant for Shepard's arrest was obtained from a magistrate, after Byrd consulted the assistant district attorney for Floyd County.[22]

On June 26, 1979 Bieri again presented a false prescription for 12 percodan tablets to Shepard, which he filled correctly. On the evening of June 26, 1979 Shepard was arrested as he left Store No. 7. When he was arrested, Shepard had a bottle of 72 percodan tablets in the pocket of the smock he was wearing. After Shepard's arrest Byrd and Bieri conducted another inventory of the percodan tablets at Store No. 7. They discovered that 10 tablets were missing and that the prescription Bieri gave to Shepard for 12 tablets on June 26, 1979 was altered to show that 42 tablets had been dispensed. Also, a percodan prescription for a person named Linda Shores had

apparently been altered from 18 to 40 tablets.

Byrd and Bieri apparently took no steps to ensure that Morrison was not responsible for the shortage of Schedule II drugs at Store No. 7 on June 20, 1979. An indictment by a grand jury was returned against Shepard based on the foregoing incidents on September 12, 1979.

■■■ The Court first notes that the return of an indictment by the grand jury, the issuance of an arrest warrant for the plaintiff and the consultation of counsel before securing an arrest warrant for the plaintiff constitute only prima facie evidence of probable cause.[23] Also, it appears that probable cause to arrest did not, in a factually indisputably manner, exist when Shepard was physically arrested because a reasonable person may have investigated further to determine whether Morrison was responsible for the shortage of percodan tablets discovered on June 20, 1979 and the alteration of the prescription filled that day. *Accord Melton, supra,* at 823–24, 282 S.E.2d 393. If Byrd and Bieri took Morrison's key to the safe on January 25, 1979, it does appear, however, that probable cause to arrest did indisputably exist after the bottle of 72 percodan tablets was discovered on Shepard and after the second inventory of Schedule II drugs was conducted by Byrd and Bieri. It is unclear, however, from the record whether Byrd and Bieri took this key. Because the Court wishes to have the record fully developed

---

**22.** The Court notes that the record is devoid of evidence regarding the information which Byrd presented to the magistrate to obtain the arrest warrant.

**23.** It is interesting to note that, in Georgia, although the elements of a section 1983 claim and a state-law claim for malicious prosecution are identical once the constitutional threshold for a section 1983 claim is met, the effect of the return of a grand jury indictment has a radically different impact on these two claims. In the section 1983 action this occurrence immunizes arresting officers from liability, but not private citizens. In the state-law malicious-prosecution action this occurrence does not in itself immunize any person. This inconsistency exists because the effect of the return of a grand jury indictment has been applied only in the context

of its effect on a qualified immunity defense, rather than its effect in a causation context. Arguably, this inconsistency should not exist because the return of an indictment should defeat a section 1983 malicious-prosecution action against a citizen on grounds of causation. *But see Arnold v. IBM, Corp.,* 637 F.2d 1350 (9th Cir.1981). This Court is hesitant to so hold, however, in view of the fact that the section 1983 claim in this case is supposed to be derived from the common law, *see generally Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and the common law does not immunize a private citizen from a malicious prosecution action even when a grand jury indictment has been returned. *See* W. PROSSER, THE LAW OF TORTS at 846 (4th ed. 1971).

before it determines when, if ever, probable cause to arrest existed, the Court will deny the motion for summary judgment filed by Byrd and Bieri on this ground at this time. After a full explication of the facts at trial, the Court may grant a partial directed verdict in favor of Byrd and Bieri.

Byrd and Bieri next argue that they are entitled to summary judgment on the malicious prosecution claim because no evidence of malice exists. Shepard has stated, however, that he felt Byrd arrested him out of personal vindictiveness. *See* Deposition of Shepard at 32, 58. Furthermore, no evidence exists which demonstrates that Byrd investigated Morrison to determine whether he was responsible for the shortage of Schedule II drugs on June 20, 1979 at Store No. 7. After all, Morrison performed all the inventories of Schedule II drugs at Store No. 7 and had ample access to these drugs. Finally, although massive pleadings have been filed in this case, Byrd has provided the Court with only vague testimony concerning the manner in which he secured the arrest warrant for Shepard. *See Peppas, supra;* Affidavit of Lanier at 2. Thus, it is proper to deny summary judgment on this ground as to Byrd.

A weaker case, for summary judgment purposes, of malice exists with regard to Bieri. Shepard did not feel that Bieri acted out of personal spite in investigating and arresting him. Rather, Shepard simply felt that Bieri "acted unprofessionally." *See* Deposition of Shepard at 32. Moreover, Bieri did not secure the arrest warrant for Shepard or act unreasonably when arresting Shepard. Bieri apparently did not, however, investigate Morrison to be sure he was not responsible for the drug shortage on June 20, 1979 at Store No. 7. An inference, ever so slight, of malice arises from this circumstance. The Court therefore will deny both Byrd and Bieri's motion for summary judgment on the ground of lack of malice at this time.[24] The record

may, however, demonstrate that the allegation of lack of malice against both Byrd and Bieri is but a "slim reed."

Finally, Byrd and Bieri argue that they are entitled to summary judgment on the malicious-prosecution claim because they are immune in their individual capacity from such an action. Under Georgia law a government official exercising a discretionary function is immune from civil liability for his actions only if "the acts complained of are done within the scope of the officer's authority, and without wilfulness, malice, or corruption." *Gray v. Linahan,* 157 Ga.App. 227, 228, 276 S.E.2d 894 (1981); *see Nelson v. Spalding County,* 249 Ga. 334, 337, 290 S.E.2d 915 (1982). Because evidence of malice exists with regard to both Byrd and Bieri, this argument is unpersuasive.

In addition to arguing that the facts of this case establish the absence of malice and the existence of probable cause to arrest, Byrd, Bieri and Morrison argue that the Board's finding that Shepard was guilty of mishandling Schedule II drugs at Store No. 7 establishes the existence of probable cause as a matter of law. They base this contention on the doctrines of res judicata and collateral estoppel.

28 U.S.C. § 1738 (1966) requires federal courts to give preclusive effect to state-court judgments whenever the courts of the state from which the judgments emerged would do so. *See Migra v. Warren City School District Board of Education,* — U.S. —, 104 S.Ct. 892, 896–898, 79 L.Ed.2d 56 (1984); *Haring v. Prosise,* — U.S. —, 103 S.Ct. 2368 at 2373, 76 L.Ed.2d 595 (1983); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Georgia's doctrine of res judicata is outlined in GA.CODE ANN. § 110–501 (Harrison 1973), which provides:

A judgment of a court of competent jurisdiction shall be conclusive between *the same parties and their privies* as to

24. *But cf. Ramsey v. Leath,* 706 F.2d 1166, 1169–70 (11th Cir.1983) (subjective claim of police officers that the city council's decision to demote them was motivated by anti-union animus was insufficient to withstand summary judgment).

all matters put in issue, or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered, until such judgment shall be reversed or set aside.

(emphasis added). Because Byrd, Bieri and Morrison were neither parties to the license revocation proceeding or privies to this proceeding, the judgment in that proceeding is not binding in the present litigation. *See Jones v. Gann,* 703 F.2d 513, 514–15 (11th Cir.1983); *Walka Mountain Camp No. 565, Woodmen of the World, Inc. v. Hartford Accident & Indemnity Co.,* 222 Ga. 249, 251–52, 149 S.E.2d 365 (1966); *Colodny v. Krause,* 141 Ga.App. 134, 135–36, 232 S.E.2d 597, *cert. denied* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

 The doctrine of collateral estoppel—or as it is called under Georgia law, estoppel by judgment—is somewhat different from the doctrine of res judicata. As stated by the court in *Usher v. Johnson,* 157 Ga.App. 420, 421–22, 278 S.E.2d 70 (1981):

> [T]he doctrine of estoppel by judgment ... has reference to previous litigation between the same parties, based upon a different cause of action ... there is an estoppel by judgment only as to such matters within the scope of the previous pleadings as necessarily had to be adjudicated in order for the previous judgment to be rendered, or as to such matters within the scope of the pleadings as might or might not have been adjudicated, but which are shown ... to have been actually litigated and determined.

*See also Forrester v. Southern Ry. Co.,* 268 F.Supp. 194, 197 (N.D.Ga.1967). Thus, "[w]hile res judicata applies only as between the same parties and upon the same

cause of action to matters which were actually in issue or which under the rules of law could have been put in issue, estoppel by judgment applies as between the same parties upon any cause of action to matters which were directly decided in the former suit." *Firestone Tire & Rubber Co. v. Pinyan,* 155 Ga.App. 343, 345, 270 S.E.2d 883 (1980). Regarding the "same parties" requirement for judicial estoppel, the *Pinyan* court stated, "While the phrase 'same parties' does not mean that all of the parties on the respective sides of the litigation in the two cases shall have been identical, it does mean that those who invoke the defense and against whom it is invoked must be the same." *Id.* The doctrine of judicial estoppel therefore does not bar Shepard's section 1983 action because Byrd, Bieri and Morrison were not parties in the Board proceeding.[25]

 In Morrison's sixth argument, he contends that he is entitled to summary judgment on Shepard's section 1983 claim because no facts exist which indicate that Morrison conspired with the other defendants to deprive Shepard of his constitutional rights.[26] It is well-established that a conspiracy action may be maintained under section 1983, as well as under section 1985(3). *See Ryland v. Shapiro,* 708 F.2d 967, 974 (5th Cir.1983); *Slavin v. Curry,* 574 F.2d 1256, 1260–61 (5th Cir.), *modified,* 583 F.2d 779 (5th Cir.1978); *Taylor v. Gibson,* 529 F.2d 709, 715 (5th Cir.1976); *Nesmith v. Alford,* 318 F.2d 110, 126 (5th Cir.1963), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964); *Jones v. Sears, Roebuck & Co.,* 495 F.Supp. 319, 321 (S.D.Ga.1980). Conspiracy claims under section 1983 and section 1985(3) are,

---

**25.** Even if Byrd, Bieri and Morrison were parties to the license revocation proceeding, it is doubtful Shepard's section 1983 and malicious prosecution claims would be barred. *See generally Haring, supra; New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education,* 654 F.2d 868, 876–77 (3rd Cir.1981).

**26.** Originally, Shepard brought conspiracy claims under both section 1983 and 1985(3). For an action to succeed under section 1985(3),

a plaintiff must show "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *see Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483 at 1486, 1487–88, 75 L.Ed.2d 413 (1983); *McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 928 (5th Cir.1977). Shepard could not make such a showing and he therefore voluntarily dismissed the section 1985(3) claim.

however, different in their nature. As explained in *Nesmith, supra:*

> [F]or a claim under § 1983, a conspiracy as such is not an indispensable element as it is under § 1985. But it may be charged as the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act. Conspiracy is asserted in that situation on more or less traditional principles of agency, partnership, joint venture, and the like.

*See also Mizell v. North Broward Hospital District,* 427 F.2d 468, 472 (5th Cir. 1970); *Mansell v. Saunders,* 372 F.2d 573, 576 (5th Cir.1967).

■ For a section 1983 conspiracy action to survive a motion for summary judgment, "specific facts showing 'either the existence or the execution of the claimed conspiracy' " must be set forth by the non-moving party. *Granville v. Hunt,* 411 F.2d 9, 11 (5th Cir.1969). Furthermore, these facts must "show overt acts related to the promotion of the conspiracy, and some link between the alleged conspirators." *Croy v. Skinner,* 410 F.Supp. 117, 126 (N.D.Ga.1976). Finally, the non-moving party must show that the conspirators agreed to commit an act which deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States. *See Dollar v. Haralson County,* 704 F.2d 1540, 1543 (11th Cir. 1983); *Crowe v. Lucas,* 595 F.2d 985, 993 (5th Cir.1979). Proof of an agreement to commit an illegal act can be in the form of circumstantial evidence. *See id.*

■ In this case Morrison was intimately involved in the investigation and arrest of Shepard. He reported the initial shortages of Schedule II drugs that led to the investigation of Shepard. Morrison also helped Byrd and Bieri inventory the Schedule II drugs at Store No. 7 on June 19 and 25, 1979. Further, he apparently arranged to have Shepard work all day on June 26, 1979. Finally, he was present when Shep-ard was arrested, although he did not aid in the arrest. These facts demonstrate that Morrison took actions which led to the arrest of Shepard, the suspension and revocation of his license to practice pharmacy and his criminal prosecution. Accordingly, sufficient proof of Morrison's role in a section 1983 conspiracy has been demonstrated to survive a motion for summary judgment.

■ Morrison's final argument in his motion for summary judgment is that Shepard's section 1983 claim must fail because Morrison did not act under "color of state law." A person who is not a state official may nevertheless act under color of state law if he acts "together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744 at 2754, 73 L.Ed.2d 482 (U.S.Sup.Ct. June 25, 1982); *see Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186–187, 66 L.Ed.2d 185 (1980); *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966); *Morrison v. Washington County,* 700 F.2d 678, 683–84 (11th Cir.1983). Here Morrison's joint participation with Byrd and Bieri in the investigation and arrest of Shepard clearly meets this standard.[27]

ACCORDINGLY, the motion for summary judgment filed by the Board and its members is GRANTED. The motion for summary judgment filed by Byrd and Bieri is GRANTED on the section 1983 claim brought against them, but is DENIED as to the state-law malicious-prosecution claim brought against them, except as it applies to them in their official capacities. The motion for summary judgment filed by Enloe is GRANTED. The motion for summary judgment filed by Morrison is DENIED. Enloe, the Board and its members are DISMISSED from this action, and to the extent

---

**27.** Although Morrison did act in concert with Byrd and Bieri, he is not cloaked with the governmental immunity conferred upon them. *See*

*Dennis v. Sparks,* 449 U.S. 24, 29–30, 101 S.Ct. 183, 187–188, 66 L.Ed.2d 185 (1980).

the order of December 15, 1983 is inconsistent with this order, it is VACATED.[28]

---

**28.** Byrd and Bieri have filed a motion in limine, which was discussed at a conference held on January 17, 1984. To the extent that this order, or the rulings at the conference, do not resolve the issues raised by this motion, Byrd and Bieri may orally raise these issues prior to trial. Accordingly, the motion in limine filed by Byrd and Bieri is DISMISSED WITHOUT PREJUDICE.